Matthew L. Lalli (6105)
Annika L. Jones (16483)
**SNELL & WILMER LLP**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone:    (801) 257-1900
Facsimile:    (801) 257-1800
mlalli@swlaw.com
aljones@swlaw.com

Kimberly O. Branscome (*pro hac vice to be filed*)
Jonathan Tam (*pro hac vice to be filed*)
Matthew P. Steinberg (*pro hac vice to be filed*)
**PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP**
2029 Century Park East
Los Angeles, CA 90067-3006
Telephone:    (310) 982-4350
Facsimile:    (310) 943-1770
kbranscome@paulweiss.com
jtam@paulweiss.com
msteinberg@paulweiss.com

*Attorneys for Plaintiff Snap Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SNAP INC., a Delaware corporation,<br><br>           Plaintiff,<br><br>  v.<br><br>DEREK E. BROWN, in his official capacity as Attorney General of Utah,<br><br>KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,<br><br>           Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(***Rule 57 Speedy Hearing Requested***)<br><br>**Case No.**  2:25-cv-490<br><br>**Judge** _____ |

## INTRODUCTION

1.      Snap brings this action for immediate declaratory and injunctive relief, pursuant to

42 U.S.C. § 1983 and 28 U.S.C. § 2201, to enjoin and declare unlawful the threatened actions of

Utah Attorney General Derek E. Brown and of Utah Director of the Division of Consumer

Protection Katherine Hass (collectively "Defendants"), who effectively seek to circumvent this

Court's prior enjoinder of the Utah Minor Protection in Social Media Act of 2024, and to impose

requirements on Snap through civil litigation that violate the United States Constitution and

Section 230 of the Communications Decency Act. To that end, Snap also respectfully requests that

the Court order a "speedy hearing" of this "declaratory-judgment action." *See* Fed. R. Civ. P. 57.

2.      Snapchat was designed to be a vibrant and healthy community where people can

connect with real friends and family just like they do in the real world, while keeping the privacy,

safety, and wellbeing of the Snapchat community front and center.

3.      Snap has no higher priority than the safety of Snapchatters, over 90% of whom say

they feel comfortable, happy, and connected with friends and family when using the platform. In

the past few years alone, Snap has invested hundreds of millions of dollars into moderation teams,

trust and safety teams, and law enforcement teams, which has resulted in a doubling of the size of

its Trust and Safety team and a tripling of the size of its Law Enforcement Operations team since

2020. And, over the past decade, Snap has significantly bolstered its user protection measures to

support and safeguard Snapchatters. Snap continually evolves, updates, and advances rigorous

safety mechanisms and platform policies to protect users and limit the ability for bad actors to

misuse its platform.  As part of those efforts, Snap continues to collaborate with law enforcement,

online safety experts, parents, educators, and policymakers to further the shared goal of keeping people—especially younger people—safe online.

4.      Although thoughtful regulations and laws governing technology are necessary to provide safeguards and protect privacy, such efforts must abide by the essential protections set forth in the Constitution and in federal legislation. As the developer of a platform meant to foster constitutionally protected speech and expression, Snap opposes efforts—like those threatened by Defendants—to impose unduly restrictive, technologically infeasible, and/or speech stifling requirements on its communications platform.

5.      This is not the first time that Utah has attempted to impose such requirements on social media platforms, in contravention of the Constitution. In *NetChoice, LLC v. Reyes*, this Court preliminarily enjoined the Utah Minor Protection in Social Media Act of 2024, which required social media companies to, among other things, "implement an age assurance system to determine whether a current or prospective Utah account holder ... is a minor"—with the system being "reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%"—and required social media companies to abide by special rules with respect to Utah minors' accounts. 748 F. Supp. 3d 1105, 1114 (D. Utah 2024), *appeal filed*, No. 24-4100 (10th Cir. 2024),

6.      In so doing, this Court made a preliminary determination that the Act facially violated the First Amendment because its operative provisions—age verification and age-related restrictions—imposed unjustified, content-based restrictions on social media companies' speech. *Id.* at 1120, 1130.

7.      Undeterred, Defendants are now resorting to threatened civil litigation as a means to impose age verification requirements, as well as other age and/or content based restrictions, that this Court determined were likely in violation of the Constitution. After stating that he "wants to 'ratchet up what [the Attorney General's Office is] doing' on social media lawsuits,"[1] the Attorney General has threatened to sue Snap because of purportedly inadequate age verification requirements and age-related "guardrails." The Attorney General's threatened action is an attempted end-run around this Court's ruling that Defendants' desired methods of age verification are enjoined on First Amendment grounds.[2] *See id.* It cannot be permitted.[3]

8.      Nor should Defendants be permitted to impose restrictions through civil litigation that clearly contravene the protections offered by Section 230. Although Defendants may attempt to describe their threatened action as directed solely at content that falls outside the scope of the federal statute, the reality is that the features on which the threatened action will be based are squarely within the bounds of Section 230.

9.      Indeed, decisions about who can access Snapchat and how they can go about doing so—as well as the content displayed when accessing Snapchat—fall squarely within Snap's core

---

[1] *See* Brigham Tomco, *To Rebuild Trust, Utah's Next Attorney General Wants to Take His Office Down to the Studs*, Deseret News (Jan. 3, 2025), *available at* https://www.deseret.com/politics/2025/01/03/attorney-general-derek-brown-wants-to-return-trust-to-the-office/.

[2] Whether Defendants' claims are framed as a violation of Utah's Consumer Sales Practices Act, Utah's Consumer Privacy Act, or the Children's Online Privacy Protection Act, the same constitutional protections apply as the State's claims are predicated on Snap's alleged failures with respect to age verification and restrictions.

[3] Though Defendants threaten litigation against Snap under a different statute than the one enjoined as likely unconstitutional in *Reyes*, the effect of the threatened litigation here is the same.

function as a publisher or speaker of third-party content. As such, Section 230 precludes claims related to specific features—like ephemeral and private messaging, and Snap's recommendation algorithm—and also prevents attempts to recast those claims as sounding in a failure-to-warn or a misrepresentation.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 because it arises out of claims under the First and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. §§ 1983 and 1988, and Section 230.

11.     This Court also has supplemental jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025).

12.     This Court has authority to grant legal and equitable relief under its own legal and equitable powers as well as 42 U.S.C. § 1983, in addition to the authority to grant injunctive relief under 28 U.S.C. § 1651 and declaratory relief under 28 U.S.C. §§ 2201 and 2202.

13.     This Court has also authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

14.     This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Utah.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred within this District.

## PARTIES & STANDING

16.     Snap is a Delaware corporation headquartered in Santa Monica, California. Snap's mission is focused on developing an application that empowers people to express themselves, live in the moment, learn about the world, and have fun together.

17.     Snap has constitutional standing to assert its own First Amendment interests and immunity under Section 230. Snap has sustained an injury-in-fact because it intends to "engage in a course of conduct arguably affected with a constitutional interest" (*i.e.*, continuing to make Snapchat available in its current form), but which Defendants contend is "proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160-161 (2014); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (similar); *Reyes*, 748 F. Supp. 3d at 1119 ("[NetChoice] members have individual standing to sue because they are subject to the Act and will face injury in the form of liability if they violate its operative provisions."). In other words, Snap faces injury in the form of liability if it is subject to the State's unconstitutional efforts, and such injury is directly traceable to Defendants, who have authority to file suit against Snap. Any such injury (compliance or liability) is readily redressable by the relief sought here. *See Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019) ("If, in a suit 'challenging the legality of government action,' 'the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992))).

18.     Snap also has constitutional standing to assert the First Amendment interests of its current and prospective users. Snap's users have sustained a redressable injury-in-fact because,

with the State's imminent civil action: (a) the State aims to prevent Snapchat users—in whole or in part—from engaging in and accessing constitutionally protected speech and expression on Snapchat; and/or (b) the State will otherwise enact barriers to Snapchat users accessing constitutionally protected speech and expression on Snapchat.[4] Snap asserts the First Amendment rights of Snapchat users insofar as Snap is the developer of a platform meant to foster constitutionally protected speech and expression; Snap does not assert any right of its users to engage in particular types of speech and expression, as Snap is not responsible for the particular types of speech and expression that are generated by the users of Snapchat.

19.    In addition to constitutional standing, Snap also has prudential standing to assert the First Amendment rights of its users. Invasive and burdensome data collection processes imposed on teenagers and adults alike would inevitably lead to "an unnecessarily broad

---

[4] This is illustrated by cases specific to age verification requirements. *See, e.g.*, *Am. C.L. Union v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998) (mandatory age verification "violates the First and Fourteenth Amendments of the United States Constitution because it prevents people from communicating and accessing information anonymously"), *aff'd*, 194 F.3d 1149 (10th Cir. 1999); *see also, e.g.*, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004) (an age-verification requirement using credit card numbers "creates First Amendment problems of its own" because "many adults may be unwilling to provide their credit card number online" and "[s]uch a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card"); *Se. Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773, 782 (D.S.C. 2005) (age verification creates a "First Amendment problem" because "age verification deters lawful users from accessing speech they are entitled to receive").

This is also illustrated by First Amendment cases more broadly. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (noting that it is "now well established that the Constitution protects the right to receive information and ideas" and "to be free … from unwanted governmental intrusions into one's privacy and control of one's thoughts"); *Martin v. City of Struthers*, 319 U.S. 141, 146, 149 (1943) (holding that ban on door-to-door distribution of circulars violated First Amendment right to receive information); *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (outlining how a chilling effect exists for purposes of determining First Amendment injury-in-fact whenever government action is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights" (citation omitted) (alterations adopted)).

suppression of speech," because there is no way to restrict teenagers' access to content "without also [deterring and] denying access to adults," whose First Amendment rights would therefore be curtailed. *Reno v. Am. C.L. Union*, 521 U.S. 844, 875-76 (1997). Snap is appropriately situated to assert those First Amendment rights, as the developer of a platform meant to foster constitutionally-protected speech and expression via its user base (a fraction of whom may be 'customers'). *See Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 215-16 (4th Cir. 2020) (collecting cases); *see also Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023); *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1173 n.32 (10th Cir. 2006).[5]

20.    Defendant Derek E. Brown is the Attorney General of Utah. He is a resident of Utah and is sued in his official capacity. He has "exclusive authority" to enforce the Utah Consumer Privacy Act ("UCPA") under which he purports to act. *See* Utah Code § 13-61-402.

21.    Defendant Katherine Hass is the Director of the Division of Consumer Protection of the Utah Department of Commerce (the "Division"). She is a resident of Utah and is sued in her official capacity. "Upon request, the [D]ivision shall provide consultation and assistance to the attorney general in enforcing [the UCPA]." *See* Utah Code § 13-61-401. The Division itself may also bring an action under the Utah Consumer Sales Practices Act ("UCSPA"). *See* Utah Code §§ 13-11-3, 13-11-17. With the Attorney General's office as counsel, the Division has filed suit under

---

[5] Courts have also found this to be the case in the context of facial challenges to age verification requirements. *See, e.g.*, *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 550-51 (S.D. Ohio 2024) (NetChoice had prudential "standing to bring both its claims on behalf of its member organizations and Ohioan minors"); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9-12 (W.D. Ark. Aug. 31, 2023) (unpublished) (similar); *see also Reyes*, 748 F. Supp. 3d at 1119 n.82 ("[T]he court determines NetChoice is entitled to a preliminary injunction based on the interests of its members alone. The court need not consider whether NetChoice has standing to advance claims on behalf of its members' users.").

the UCSPA against other social media companies. *See, e.g.*, Complaint and Jury Demand, *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 240904292 (3d Judicial Dist. Ct. June 3, 2024); Notice of Filing of Unsealed Complaint, *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023).

<u>**FACTUAL ALLEGATIONS**</u>

I.    **Overview Of Snap Inc. & Snapchat**

22.    Plaintiff Snap Inc. ("Snap") owns and operates Snapchat.

23.    Snapchat is a camera and communications service that enables users to communicate with friends and family using text, photos, and short videos.

24.    Consumers can download Snapchat directly to their mobile device by visiting the App Store (for iOS) or Google Play Store (for Android).

25.    To create a Snapchat account, you must be at least 13 years old.

26.    Snapchat is typically used for communications between small groups of people who already know each other in real life. Snapchat opens to a camera rather than a feed of content, and its best-known feature—the 'Snap'—is used to create and send photo and video messages between friends, which by default disappear from the service after they are read or viewed. This default ephemerality feature is designed to mirror real-life interactions. Just as friends talking in person do not typically record their conversations, Snapchat does not by default record user interactions and instead affords users a digital way "to show a more authentic, unpolished, and spontaneous side of themselves," without permanent and publicly viewable posts.

27.    Snap also offers a variety of tools that users can employ to enhance and edit photos and videos before sending them to friends through the service. Users have the ability to draw and

color on Snaps and add a short text caption before sending them, to edit their images using lenses and filters (like puppy dog ears or silly glasses and hats), and to supplement their photos and videos with images and GIFs. These features are designed to be conversation starters and encourage users to stay in touch with friends when they cannot be together in person. Whereas a shy person might feel hesitant to send regular text messages just to say hello, sharing a funny Snapchat Lens or starting a Snap Streak gives Snapchat users an easy way to stay connected to the people in their lives.

28.     Snap routinely refines Snapchat's features, and creates new ones, to help provide Snapchat users with an even better experience.

29.     Since October 2013, Snapchat users are able to compile photos and videos into "Stories" available for 24 hours, which by default are viewable only by a user's friends.

30.     More recently, Snap also introduced "Spotlight," a feature that allows users to make videos that any Snapchat user can view, not just a user's contacts.

31.     Snap takes actions, and takes precautions, to support minors' safety while using the service and while out engaging with their communities. For example:

     (a)     Snapchat does not open to Stories, Spotlight, or any other feed of content.

     (b)     Videos on Spotlight are reviewed and/or moderated by Snap. For example, all content on Spotlight is first reviewed automatically by artificial intelligence and other technology before gaining any distribution; then, once content gains more viewership, it is reviewed by human moderators before potentially being recommended for distribution to a large audience.

(c)     By default, for users between the ages 13 and 17 years old, Snapchat sets their account to private and turns location sharing off. These users also need to be friends with one another to tag each other.[6]

(d)     Snap also uses a combination of human review and machine learning to identify user-generated public content that some may not find appropriate, so it is not eligible for recommendation to teen accounts.

(e)     Snap also employs advanced technology to proactively detect and block illegal and known child sexual abuse material before it can be shared on the platform.

(f)     Moreover, Snapchat empowers users to report harmful messages, images, videos, or accounts. Snapchat's Trust & Safety team reviews reported content to determine if it violates their guidelines; and, if a violation is found, they may remove the offending content, terminate or limit the visibility of the account, or notify law enforcement in certain cases.

(g)     Additionally, Snap works closely with organizations like the National Center for Missing & Exploited Children ("NCMEC") to report and address any instances of child sexual abuse, demonstrating a strong commitment to user safety and the protection of minors.

---

[6] Snapchat offers a feature called Public Profiles which is available for those 16 or 17. These older teens can post Snaps publicly or submit a video to Spotlight, though there are a variety of guardrails in place so content is posted publicly in a responsible manner. *See Snapchat Offers Older Teens 16+ an Introduction to Responsible Public Sharing with Enhanced Safeguards, Education, and New Parental Tools*, Snap Values (Sept. 10, 2024), *available at* https://values.snap.com/news/public-profiles-16-17. For example, public Stories from 16 or 17 year olds are only recommended to Snapchatters who are already their friends or followers, and to other Snapchatters with whom they share mutual friends. Younger minors (ages 13-15) do not have access to Public Profiles.

(h)    Snapchat's "Family Center," a suite of parental tools which was launched in 2022, enables a parent or guardian to see who their minor is communicating with on Snapchat.

(i)    Through Snapchat's "Family Center," a parent or guardian can also further limit their minor's ability to view sensitive content in Stories and Spotlight, above and beyond the limitations already set by Snap's Community Guidelines for all users across the platform.

(j)    Additionally, Parents can block Snapchat's generative AI chatbot—which was first launched in 2023—from responding to their minor.

(k)    Parents are able to request their teen's location on Snap Map, so they know where their teen is.

32.    As reflected in Snapchat's Privacy Policy, Snap does not share information with advertisers that directly identifies Snapchat users, such as a user's name, phone number, or email address.

33.    As is also reflected in Snapchat's Privacy Policy, users' information may be shared with Snap's service providers, third-party apps (if the user decides to connect their account to those third-party apps), business and integrated partners (like OpenTable within Snapchat), and Snapchat's internal subsidiaries.

## II.    Utah's Unconstitutional Attempts To Regulate Social Media

34.    Over the past two years, the Utah Legislature has enacted two laws aimed at social media platforms.

35.     First, the Utah Legislature enacted the Utah Social Media Regulation Act of 2023 (Utah Code § §13-63-101 *et seq.*) (the "2023 Act"). This first-of-its-kind law included: (a) a parental consent requirement for minors to create or access social media accounts; (b) mandatory age verification for all Utah social media account holders; (c) restrictions on social media advertising, targeted content, and data collection for minors; (d) a curfew prohibiting minors from accessing social media websites between 10:30pm and 6:30am; and (e) design requirements to prevent features that could cause "addiction" in minors.

36.     Shortly thereafter, NetChoice, a trade association that represents social media and internet companies (including Snap), filed a lawsuit challenging the 2023 Act's constitutionality on the grounds that it violated the First Amendment and was impermissibly vague. *See Reyes*, 748 F. Supp. 3d at 1116.

37.     Additionally, a second lawsuit challenging the constitutionality of the 2023 Act was filed by minors, adults, and a youth-led organization who use social media platforms to learn, express themselves, and interact with others. *See Zoulek, et al. v. Hass, et al.*, No. 2:24-cv-00031 (D. Utah Jan. 12, 2024).

38.     Shortly after these lawsuits were filed, and prior to the 2023 Act taking effect, the Utah legislature delayed the effective date so it would have time to "repeal and replace" the 2023 Act altogether. *See* Defendant's Motion for Amended Scheduling Order, at 2, *NetChoice, LLC v. Reyes*, No. 2:23-cv-00911 (D. Utah Jan. 19, 2024), ECF No. 39.

39.    The Utah Legislature then enacted the Utah Minor Protection in Social Media Act of 2024 (Utah Code §§ 13-71-101 et seq.) (the "2024 Act"). *See Reyes*, 748 F. Supp. 3d at 1116.[7]

40.    Unfortunately, the 2024 Act seized control of the online experience from parents, disregarded the importance of education, sidelined the State's vibrant creator economy, compromised data security, and violated constitutional rights. This is evidenced, in large part, by the text of the 2024 Act's two component parts:

(a)    The first part of the 2024 Act required social media companies to "implement an age assurance system to determine whether a current or prospective Utah account holder ... is a minor," *see id.* (quoting Utah Code § 13-71-201(1)), with the system being "reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%," *see id.* (quoting Utah Code § 13-71-101(2)); and, in conjunction, it also required social media companies to "implement a review process allowing account holders to appeal the account holder's age designation by submitting documentary evidence to establish the account holder's age range," with the social media company "review[ing] evidence submitted by the account holder and mak[ing] a determination within 30 days of submission of the evidence," *see id.* at 1114 (quoting Utah Code § 13-71-201(3)(a)).

_____

[7] *See also* Video posted by the Office of the Utah Attorney General (@utahago), Instagram, *How Utah Attorney General Derek Brown is Protecting Kids from the Harms of Social Media* (Mar. 19, 2025), *available at* https://www.instagram.com/reel/DHZhS4zufA-/ ("[Attorney General Brown:] We passed bills here in Utah specifically to address [social media] issue[s] …. As Utah's Attorney General, this is one of the most important things that we need to do, and I will continue to do everything in our power to protect kids from the harms of social media.").

(b)    The second part of the 2024 Act subjected social media companies to special rules with respect to Utah minors' accounts. *Id.* For example, it required social media companies to "set default privacy settings to prioritize maximum privacy" in specific ways that it enumerated, unless a social media company "first obtain[ed] verifiable parental consent." *Id.* (quoting Utah Code §§ 13-71-101(5) and 13-71-204(1)

41.    NetChoice filed an amended complaint alleging that the 2024 Act is unconstitutional for many of the same reasons as the 2023 Act—and also as a result of new flaws in the 2024 Act, such as the regulation of who minors can speak with absent parental consent. *Id.* at 1114-15. NetChoice then sought to preliminarily enjoin the 2024 Act. *Id.*

42.    On September 10, 2024, this Court granted NetChoice's motion for a preliminary injunction, finding NetChoice was substantially likely to succeed on its First Amendment claims. Specifically, this Court held that NetChoice was substantially likely to succeed in arguing that "the entire [2024] Act facially violates the First Amendment because the Act's operative provisions … impose[] unjustified, content-based restrictions on social media companies' speech." *Id.* at 1120, 1130.

## III.    Utah's Attempts To Enforce Requirements Of Unconstitutional Laws

43.    In early 2023, a reporter asked the Governor of Utah what it would "look like if social media companies join you and become part of the solution … and want to avert legal action here?" The Governor responded by stating that:

> [T]he purpose of legal action [against social media companies] is manyfold as the attorney general has been so articulate [in explaining] this morning. But it really is about protecting our kids. ***It's so critical that this age verification piece—I think is an absolute necessity—that we're actually able to prevent young people from accessing social media, and then once they're able to***

15

> ***do that that it is age-appropriate material that that is in front of them***.

*Gov. Cox Holds Press Conference on Social Media in Utah*, YouTube (Jan. 23, 2023), *available at* https://www.youtube.com/watch?v=9O54lxx9TbE (cleaned up) (emphasis added).

44.    Later that year, the Utah Division of Consumer Protection issued a subpoena to Snap.

45.    In its 2023 subpoena, the Division of Consumer Protection claimed it had reason to believe that Snap was engaging in an act or practice that violated the UCSPA. The subpoena called upon Snap to produce numerous documents, including documents related to Snap's age verification processes and other features that are integral to how users communicate and receive content (*e.g.*, ephemeral messaging, Snap Streaks, My AI, and Snap's recommendation algorithm). The subpoena stated that failure to comply could result in a contempt or civil enforcement proceedings.

46.    Snap complied with the subpoena, by providing its initial written response and document production on February 15, 2024 and making additional productions since that time.

47.    In early 2025, Snap received another subpoena. This subpoena was issued by the Attorney General's Office, pursuant to 15 U.S.C. § 6504, and stated that the Attorney General's Office had reason to believe Snap was engaging in an act or practice that violated the Children's Online Privacy Protection Act ("COPPA"). Like the previous subpoena, the 2025 subpoena stated that Snap's "failure to comply" could result in a contempt or civil enforcement action.

48.    Snap again complied with the subpoena and responded to the Attorney General's Office on February 10, 2025.

49.     In accordance with the Attorney General stating that he "wants to 'ratchet up what [the Attorney General's Office is] doing' on social media lawsuits,"[8] the Attorney General sent Snap an Enforcement Letter dated May 22, 2025. *See* **Exhibit 1**.

50.     The Enforcement Letter explains that the Office of the Attorney General received a referral from the Utah Division of Consumer Protection related to Snap's business practices, which the Division believes violate the UCPA and COPPA.

51.     More specifically, the Enforcement Letter asserts that Snap has: (a) violated the UCPA because Snap's internal documents supposedly "confirm that [Snap] not only shares conversations that users have with the My AI feature with OpenAI, but that they are stored by OpenAI for up to thirty days—a third party that is not identified in customer sign-up pages, pop-up disclaimers, the privacy policy, or in related privacy and service provider pages"; (b) violated the UCPA as to all users because there is purportedly "no clear notice or ability to opt out of the processing of sensitive data which My AI collects when default settings are enabled"; and (c) also violated the UCPA and COPPA because of purportedly "inadequate age gate and deficient guardrails to prevent access by those under the age of thirteen" and the "parents of underage users [not being] given [an] opportunity to affirmatively consent to use of the technology. *See id*.

52.     The Enforcement Letter states that it "constitutes the requisite notice under [Utah Code] section 13-61-402," which mandates that the Attorney General provide notice at least 30 days prior to initiating a civil "enforcement action." *See id*.

---

[8] *See* Brigham Tomco, *To rebuild trust, Utah's next attorney general wants to take his office down to the studs*, Deseret News (Jan. 3, 2025), *available at* https://www.deseret.com/politics/2025/01/03/attorney-general-derek-brown-wants-to-return-trust-to-the-office/.

53.    During a discussion with Snap shortly thereafter, the Attorney General's Office reiterated that it plans to file a civil action against Snap, and that the action will also assert claims under the UCSPA.

54.    In Defendants'[9] two pending civil actions against TikTok, and Defendants' pending civil action against Meta, claims are asserted under the UCSPA. Among other things, Defendants' claims concern purported issues with adequately identifying users' ages, "serv[ing] content to children that is not appropriate for their age," facilitating illicit acts, making misrepresentations about an app's safety and security in connection with the same, and a variety of other features that are integral to how users communicate and receive content. *See, e.g.*, Complaint and Jury Demand, at ¶¶ 127-130, *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 240904292 (3d Judicial Dist. Ct. June 3, 2024) ("Over the years, TikTok has publicly advertised new tools to help moderate and limit distribution of certain material …. Yet all of TikTok's age-gating policies are plagued by a fundamental flaw: TikTok allows underage users to falsify their birthday and does nothing to verify their stated age. Because the company fails to identify users' ages, it exposes children to content and themes that it knows are inappropriate or even dangerous."); Notice of Filing of Unsealed Complaint, at ¶ 148, *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023) ("Despite its public representations about prioritizing user safety and shielding children from inappropriate content, Meta knows that it serves content to children that is not appropriate for their age.").[10]

---

[9] The Division is the plaintiff in these lawsuits and the Division is represented by the Attorney General's Office.

[10] *See also, e.g.*, Notice of Filing of Unsealed Complaint, at ¶ 236, *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023) ("Meta's

55.     It is Snap's understanding that a lawsuit filed by Defendants against it will have a similar focus under the UCSPA, and implicate the features targeted by the 2023 subpoena (*e.g.*, ephemeral messaging, Snap Streaks, My AI, and Snap's recommendation algorithm) and the subsequent subpoena.

56.     In sum, the Attorney General has provided explicit notice to Snap that it intends to file a civil lawsuit against Snap. And, with respect to any such lawsuit, it is Snap's understanding that Defendants will assert claims stemming from: (a) purportedly inadequate age verification and age gating requirements, even though this Court has enjoined Utah's efforts to impose the same— or similar—stringent requirements on social media on the grounds that they likely violated the

---

unconscionable acts and practices include its choice to target its Social Media Platforms to children while knowingly designing its Platforms to include features that Meta knew to be psychologically and physically harmful to children—including features known to promote compulsive, prolonged, and unhealthy use by children."); *id.* at ¶ 247 ("[I]n connection with the advertising, marketing, promotion, and other representations regarding their products, including through the actions described herein, Meta made deceptive representations, directly or indirectly, expressly or by implication, with the intent that consumers rely on the deceptive representations, including but not limited to the following: (a) misrepresenting that Meta's Social Media Platforms are not designed to hook children; (b) misrepresenting the appropriateness of its Platforms for children and obscuring or hiding known risks children will be exposed to extreme and harmful content, including suicide and self-harm; (c) misleading parents and consumers about features it knows promote body dysmorphia and eating disorders in children; (d) misleading consumers about the harms children face from social comparison on its Social Media Platforms; and (e) misrepresenting and downplaying its internal research findings about children and mental health.").

*See also, e.g.*, Complaint and Jury Demand, at ¶ 159, *Utah Div. of Consumer Protection v. TikTok Inc.*, 240904292 (3d Judicial Dist. Ct. June 3, 2024) ("TikTok fails to notify users—particularly children and parents—of the increased potential danger of kids being taken advantage of financially, including through TikTok's virtual currency system, and dangerous interactions with criminals on the platform, particularly when exchanging virtual currency, which is a deceptive practice and material omission in violation of the UCSPA"); *id.* at ¶ 171 ("TikTok provides the venue—TikTok LIVE—and a currency—TikTok Coins—for which actors both pay for and profit from the sexual exploitation of children, including reported cases of trafficking and the distribution of pornographic material, as well as other illicit acts like money laundering, and drug sales.").

First Amendment; (b) specific Snapchat features that are integral to how users receive content—such as ephemeral messaging, Snap Streaks, and Snap's recommendation algorithm—that fall squarely within the ambit of Section 230; (c) information generated during user interactions with My AI that falls within the scope of the First Amendment; and (d) the handling of users' data, even though Snap does so in compliance with COPPA.

## CLAIMS

**COUNT ONE**
**VIOLATION OF THE RIGHTS OF SNAP AND SNAPCHAT USERS**
**UNDER THE FIRST AMENDMENT AND THE FOURTEENTH AMENDMENT OF**
**THE UNITED STATES CONSTITUTION**
**FREE SPEECH CLAUSE; FREE PRESS CLAUSE; RIGHT OF ASSEMBLY**
**42 U.S.C. § 1983**

57.     All preceding paragraphs are incorporated by reference.

58.     As incorporated against the States, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law ... abridging the Freedom of Speech, or of the Press." *See* U.S. Const. amend. I.

59.     Among other things, the Free Speech and Free Press Clauses help protect the following actions from government interference:

(a)     "publish[ing]" protected speech, *see Reno*, 521 U.S. at 852;

(b)     "disseminat[ing]" protected speech, *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023); and

(c)     "creating, distributing, [and] consuming" protected speech, *see Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011).

60.     This constellation of First Amendment protections extends to all manner of private entities, including social media companies. *See generally Lovell v. City of Griffin*, 303 U.S. 444,

20

452 (1938) (the "press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion"). In the context of social media companies, such protections most often extend to "the speech [they] engage in when they make decisions about how to construct and operate their platforms." *See Reyes*, 748 F. Supp. 3d at 1120; *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024) (underscoring that social media companies "mak[ing] choices about what third-party speech to display and how to display it" is protected by the First Amendment).

61.     The importance of providing First Amendment protections in the context of social media applications cannot be overstated. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear[:] It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

62.     As such, by threatening—and subsequently confirming—that it will bring an imminent civil lawsuit based on a purported requirement that "parents of underage users [must be] given [an] opportunity to affirmatively consent to use of" Snapchat—and because it believes that Snap has inadequate age gate and deficient guardrails to prevent access by those under the age of thirteen—Defendants are attempting to strip away the First Amendment rights of Snapchat users and Snap itself without regard for how vital such rights are in modern society. *See* **Exhibit 1**. And Defendants are trying to saddle Snap with nonrecoverable compliance costs. *See Cloud Peak Energy Inc. v. U.S. Dep't of the Interior*, 415 F. Supp. 3d 1034, 1042 (D. Wyo. 2019).

63.     The constitutional impact of Defendants' actions will only compound, if Defendants are allowed to file suit against Snap, as: (a) Defendants will undoubtedly then assert

that even more aspects of Snap and Snapchat need to be curtailed; and (b) Defendants may then feel even more emboldened to accomplish through civil litigation what they cannot accomplish through the legislative process, going forward. *See, e.g.*, Notice of Filing of Unsealed Complaint, *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023); Complaint and Jury Demand, *Utah Div. of Consumer Prot. v. TikTok Inc.*, 240904292 (3d Judicial Dist. Ct. June 3, 2024); *see also, e.g.*, *Brown v. Kelly*, 609 F.3d 467, 472 n.3 (2d Cir. 2010) (underscoring that state actors have an obligation to "eliminate enforcement" of a statute that a competent court has already struck down).

64.    Defendants cannot reasonably contend otherwise. "To condition the exercise of First Amendment rights on the willingness of an adult to chaperone," as Defendants are attempting to do here, "is to curtail" such rights. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1064 (7th Cir. 2004); *see also Brown*, 564 U.S. at 802 ("[P]unishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority."); *id.* at 795 n.3 (underscoring that the government lacks "the power to prevent children from hearing or saying anything without their parents' prior consent"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) ("[T]he values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.").

65.    And to curtail such rights is to "bar[] access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge," *see Packingham*, 582 U.S. at 107, which is particularly problematic when access is barred for

adults and teenagers alike, *see Johnson*, 4 F. Supp. 2d at 1029, 1033 (holding that mandatory age verification "violates the First and Fourteenth Amendments of the United States Constitution because it prevents people from communicating and accessing information anonymously"), *aff'd*, 194 F.3d 1149 (10th Cir. 1999); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252 (2002) ("Speech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it.").

66.    To curtail such rights is also to impede Snapchat users' ability to peaceably assemble to engage in otherwise lawful speech activities with persons of their choosing, *see Thomas v. Collins*, 323 U.S. 516, 530-40 (1945), insofar as social-media platforms have become the "modern public square," *see Packingham*, 582 U.S. at 107. "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental" to the fabric of our country, and does not yield to Defendants' misguided attempt to limit who can access Snapchat and how they can go about doing so. *See De Jonge v. Oregon*, 299 U.S. 353, 364-65 (1957) ("The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score.").

67.    Additionally, insofar as Defendants take issue with information generated during user interactions with My AI, they do so in contravention of the First Amendment. To be sure, how artificial intelligence interacts with the First Amendment is a nascent area of the law; but, "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (citation and internal quotation marks omitted). And it is well settled that "the creation and dissemination

of information are speech for First Amendment purposes," *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 553 (2011), such that the curation of training data for—and post-training interventions to directly engineer the behavior of—a generative artificial intelligence tool engender First Amendment protections for that tool's speech, *see Moody*, 603 U.S. at 729-30; *see also Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002).

68.     In all events, Defendants cannot constitutionally compel Snap to speak, including by threatening a civil lawsuit if Snap does not "opine on and mitigate the risk" supposedly engendered by certain aspects of Snap's design. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116, 1119-22 (9th Cir. 2024); *see also id.* ("[A] disclosure regime that requires the forced creation and disclosure of highly subjective opinions about content-related harms to children is unnecessary for fostering a proactive environment in which companies, the State, and the general public work to protect children's safety online.").

69.     "The loss of First Amendment freedoms" to Snap and Snapchat users, as outlined above, "unquestionably constitutes irreparable injury," *see Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019), and is so significant that "most courts hold that no further showing of irreparable injury is necessary" in this context, *see Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citation omitted). Snap can easily make a further showing here, though.

70.     That is because the "loss of reputation, good will, marketing potential," and customers as a result of Utah's threatened actions "constitutes irreparable injury" as well. *See Lovesac Co. v. www.lovessac.com*, 2022 WL 504192, at *4 (D. Utah Feb. 18, 2022) (unpublished) (collecting authority); *see also, e.g.*, *Utah Sues Meta for Child Addiction Harm and Deceiving*

24

*Parents About Dangers of Facebook and Instagram*, Governor of Utah Spencer J. Cox (Oct. 24, 2023), *available at* https://governor.utah.gov/press/utah-sues-meta-for-child-addiction-harm-and-deceiving-parents-about-dangers-of-facebook-and-instagram (asserting, among other things, that "Meta deceived parents and consumers"). So, too, does the imposition of nonrecoverable compliance costs, including the amount Snap would need to expend to implement the unconstitutional features called for by Defendants. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1130-31; *see also, e.g.*, *Kansas v. U. S. Dep't of Educ.*, 739 F. Supp. 3d 902, 932 (D. Kan. 2024); *Cloud Peak Energy Inc*, 415 F. Supp. at 1034. Such compliance costs are undoubtedly many multiples in excess of the nonrecoverable compliance costs of more than a thousand dollars per year that constituted an irreparable injury in *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010), for example.

71.     For the foregoing reasons, absent prompt injunctive and declaratory relief precluding Defendants from bringing suit on grounds that violate the First Amendment, Snap and Snapchat users will be irreparably harmed.

72.     Moreover, prompt injunctive and declaratory relief is appropriate under Section 1983, in light of both the constitutional rights at issue and the fact that Defendants are effectively attempting to enforce a statute that this Court preliminarily enjoined them from enforcing. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1130-34. This Court, and others, routinely enjoin state actors from enforcing, prosecuting, investigating or reviewing any matter based on a legal premise that is declared to violate the First Amendment. *See, e.g.*, *Am. C.L. Union v. Johnson*, 194 F.3d 1149, 1163 n.11 (10th Cir. 1999); *Chapman*, 362 F.3d at 233; *Am. Booksellers Found. v. Dean*, 342 F.3d

96, 105 (2d Cir. 2003); *Reyes*, 748 F. Supp. 3d at 1130-34; *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1297 (D. Utah 2023).

**COUNT TWO**
**VIOLATION OF SNAP'S RIGHTS**
**UNDER THE COMMUNICATIONS DECENCY ACT**
**47 U.S.C. § 230 AND 42 U.S.C. § 1983**

73.    All preceding paragraphs are incorporated by reference as if set forth fully herein.

74.    Under Section 230, Congress granted all providers of interactive computer services "broad immunity" for "all claims stemming from their publication of information created by third parties." *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1042 (W.D. Tex. 2024) (citation omitted).

75.    Congress did so to preserve the "extraordinary advance in the availability of educational and informational resources" brought by the internet and interactive computer services, *see* 47 U.S.C. § 230(a)(l), and to ensure that the internet remained a "forum" for free-ranging intellectual inquiry and diverse political and cultural discourse, and a "vibrant and competitive free market ... unfettered by Federal or State regulation," *see id.* § 230(a)(3), (b)(2).

76.    Subject to only a few narrow exceptions, Section 230 immunity exists whenever (a) the party claiming immunity is a "provider ... of an interactive computer service"; (b) the allegedly unlawful content was "provided by another information content provider"; and (c) another party seeks to "treat[]" the party claiming immunity as the "publisher or speaker" of that information. 47 U.S.C. § 230(c)(l). In other words, "[a] defendant loses its immunity to the extent that the cause of action seeks to treat the defendant 'as the publisher or speaker of its own content—or content that it created or developed in whole or in part—rather than [as] the publisher or speaker of entirely third-party content." *See Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025) (citation

omitted)); *accord Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (holding that Section 230 immunizes an interactive computer service in the "exercise of its editorial and self-regulatory functions.").

77.   All three elements of Section 230 are satisfied here.

78.   As courts have recognized, Snap is a "provider" of an "interactive computer service" within the meaning of 47 U.S.C. §§ 230(c)(l) and 230(t)(2). *See, e.g.*, *L.W. v. Snap Inc.*, 675 F. Supp. 3d 1087, 1095 (S.D. Cal. 2023); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 825 (N.D. Cal. 2023).

79.   The Attorney General's pursuit of Snap and threat of an imminent civil lawsuit invariably treats Snap as a "publisher or speaker" of content, as it turns on Snap making content available to Utahans through the operation of Snapchat.[11]

80.   As noted, the Attorney General is threatening Snap based on his purported belief that "parents of underage users [must be] given [an] opportunity to affirmatively consent to use of" Snapchat—and that Snap has "inadequate age gate and deficient guardrails to prevent access by those under the age of thirteen." *See* **Exhibit 1**. Additionally, the Attorney General has informed Snap that the State will bring claims under the UCSPA. It is Snap's understanding that such claims

---

[11] To the extent Defendants view Snap as merely a "distributor" and not a "publisher or speaker," that is a distinction without a difference. *See Barrett v. Rosenthal*, 146 P.3d 510, 514, 519 (Cal. 2006) (finding no "reason to suppose that Congress intended to immunize 'publishers' but leave 'distributors' open to liability"). As courts have made clear, under Section 230, "distributors are considered to be publishers." *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019) (citation omitted); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997) ("[T]he probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes ...."); *In re Soc. Media*, 702 F. Supp. 3d at 827 (explaining that "courts understand [publishing] to mean 'deciding whether to publish or to withdraw from publication third-party content'" and "editorial decisions and functions ancillary to the decision to make content available").

will also turn on allegations that Snap fails to adequately identify users' ages with its age-gating, "serves content to children that is not appropriate for their age," facilitates illicit acts, makes misrepresentations about its app's safety and security in connection with the same, and incorporates a variety of other purportedly problematic features into its app. *See, e.g.*, Notice of Filing of Unsealed Complaint, *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023); Complaint and Jury Demand, *Utah Div. of Consumer Prot. v. TikTok Inc.*, 240904292 (3d Judicial Dist. Ct. June 3, 2024).

81.    Yet, Section 230 immunity encompasses purported "failure[s] to implement basic safety measures to protect minors," for example. *Comput. & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1042 (citation omitted); *see also, e.g.*, *Doe*, 128 F.4th at 1148-56 (holding that Section 230 precludes state claims premised on an online platform "failing to prevent a minor from being matched with predators, by matching users based on geographic data it extracted from them, and by allowing [the minor plaintiff] to communicate with abusive adults"); *Doe ex rel. Roe v. Snap Inc.*, 2023 WL 4174061, at *1 (5th Cir. June 26, 2023) (unpublished) (holding that Section 230 precludes claims that Snap facilitated grooming and sexual assault of minor by teacher because, "[b]y its plain text, § 230 creates federal immunity to any cause of action that would make internet service providers liable for information originating with a third-party user of the service" (citation omitted)).

82.    As such, Section 230 immunity encompasses claims that take issue with age verification mechanisms, or a lack thereof, given that the premise of such claims is a failure to restrict access to certain types of third-party content. *See, e.g.*, *Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1065-66 (N.D. Cal. 2025) ("Doe's theory of liability derives from Meta's

alleged failure to include adequate age and identity verification measures that would prevent the creation of fake accounts facilitating sex trafficking communications …. Doe is seeking to hold Meta liable for its determination of who can and cannot access its platform to speak in the first place, which cuts to the core of Meta's role as a publisher. Thus, this claim is barred by Section 230."); *Social Media Cases*, JCCP No. 5255, 2024 WL 4003712, at *18 (Cal. Super. Ct. July 19, 2024) (unpublished) (concluding that Section 230 precludes allegations that the "absence of effective age verification measures ... allows predators to lie about their ages and masquerade as children" (citing *Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 565 (2009))).

83. Additionally, Section 230 immunity shields against claims implicating harms from the illegal activities and/or content of third parties using social media. *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098-1100 (9th Cir. 2019) (holding that Section 230 precludes claims that a platform's features facilitated illegal drug sales); *Herrick v. Grindr LLC*, 765 F. App'x 586, 590 (2d Cir. 2019) (holding that "Grindr's alleged lack of safety features 'is only relevant to [plaintiff's] injury to the extent that such features would make it more difficult for his former boyfriend to post impersonating profiles or make it easier for Grindr to remove them'" and such allegations are therefore precluded by Section 230 (citation omitted)); *Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016) (holding that Section 230 precludes claims "that attempt to hold website operators liable for failing to provide sufficient protections to users from harmful content created by others"); *Mann v. Meta Platforms Inc.*, 2025 U.S. Dist. LEXIS 70065, at *7 (N.D. Cal. Apr. 11, 2025) (unpublished) ("Meta's failure to remove meth-related third-party content arises from Meta's status as a publisher and would require Meta to monitor (and more effectively remove) such content. This theory of liability is barred by section 230.");

29

*L.W. ex rel. Doe v. Snap Inc*., 675 F. Supp. 3d 1087, 1095-96 (S.D. Cal. 2023) (holding that Section 230 precludes claims based on the "transmission of ephemeral content" that "facilitate[d] the exchange of CSAM," "regardless of how [plaintiffs'] claims are framed, because their theories of liability plainly turn on [Snap's] alleged failure to monitor and remove third-party content"); *Blocher v. MindGeek USA Inc.*, 2023 WL 5054696, at *3-4 (D. Nev. Aug. 8, 2023) (unpublished) (holding that Section 230 precludes claims against website for third parties' posting of sexual videos because they "boiled down to deciding whether to exclude material that third parties seek to post online"). In all events, "[p]arties complaining that they were harmed by a Web[]site's publication of user-generated content ... may sue the third-party user who generated the content." *Doe v. MySpace, Inc.*, 528 F.3d 415, 418-19 (5th Cir. 2008).

84.      At a more granular level, Section 230 immunity shields against claims flowing from features that are integral to how users receive content. While the State's subpoenas focus, in part, on specific Snapchat features—such as ephemeral messaging, Snap's recommendation algorithm, and "Snap Streaks"—such features fall within the ambit of Section 230.

(a)      As to ephemeral messaging, *see, e.g.*, *In re Soc. Media*, 702 F. Supp. 3d at 831 (holding that claims based on Snap's decision to "[l]imit[] content to short-form and ephemeral content" are barred by Section 230); *L.W.*, 675 F. Supp. 3d at 1097 (underscoring that liability may not be premised practices of publishing ephemeral content); *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (unpublished) (holding that claims based on how "Snapchat allows messages to automatically delete after a short period of time" are "barred by Section 230"), *aff'd*, 2023 WL 4174061 (5th Cir. June 26, 2023), *cert. denied*, 144 S. Ct. 2493 (2024).

(b)     As to Snap's algorithm, *see, e.g.*, *M.P. v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025) ("[W]e find persuasive the decisions of our sister circuits holding that an interactive computer service does not lose Section 230 immunity because the company automates its editorial decision-making." (citations omitted)); *Doe v. Webgroup Czech Republic*, 767 F. Supp. 3d 1009 (C.D. Cal. 2025) (noting the "the long-standing precedent that online service providers do not create content or lose Section 230 immunity simply by implementing content-neutral algorithms that generate related searches or user-uploaded content based on the users' own viewing activity"); *Doe (K.B.)*, 768 F. Supp. 3d at 1065 (similar); *In re Soc. Media*, 702 F. Supp. 3d at 833 (finding that "use of algorithms to determine whether, when, and to whom to publish third-party content" is a "traditional editorial function[] that [is] essential to publishing"); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118 (N.D. Cal. 2020) (similar) (citing *Dyroff*, 934 F.3d at 1098 and *Force*, 934 F.3d at 66).

(c)     As to Snap Streaks, *see, e.g.*, *V.V. v. Meta Platforms, Inc.*, 2024 WL 678248, at *1, 10 (Conn. Super. Ct. Feb. 16, 2024) (unpublished) (acknowledging plaintiffs' allegations regarding "Snap Streak" and "rewards" and holding that Section 230 barred all of plaintiffs' claims); *see also, e.g.*, *Doe v. Reddit, Inc.*, 2021 WL 5860904, at *5 (C.D. Cal. Oct. 7, 2021) (unpublished) (holding that the provision of "Karma awards" did not strip Reddit of Section 230 immunity), *aff'd*, 51 F.4th 1137 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2560 (2023); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016) ("We fail to see how Yelp's rating system, which is based on rating inputs from third parties and which reduces this information into a single, aggregate metric is anything other than user-

generated data. Indeed, the star-rating system is best characterized as the kind of 'neutral tool[]' operating on 'voluntary inputs' that we determined did not amount to content development ….").[12]

85.    Courts have rejected attempts to sidestep Section 230 immunity by styling allegations as failure-to-warn claims. *See, e.g.*, *Grindr*, 128 F.4th at 1154 (holding that Section 230 precludes state claims premised on an online platform failing to "warn [plaintiff] about the risks of child sexual exploitation on the App" arising from the "defendant's publishing or monitoring of third-party content"). Failure-to-warn claims are precluded by Section 230 because they seek to "fault [companies like Snap] for not mitigating, in some way, the harmful effects of the … content," which "is essentially faulting [Snap] for not moderating content in some way, whether through deletion, change, or suppression," in contravention of Section 230. *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1180 (9th Cir. 2024); *see also, e.g.*, *Herrick*, 765 F. App'x at 591 (affirming dismissal of failure-to-warn claims because they are "inextricably linked" to "alleged failure to edit, monitor, or remove the offensive [third-party] content"). Any holding to the contrary would essentially render Section 230 meaningless, since "essentially every state cause of action otherwise immunized by section 230 [could] be pleaded as a failure to warn." *Wozniak v. YouTube, LLC*, 100 Cal. App. 5th 893, 914-15 (2024).

86.    Similarly, courts have rejected attempts to sidestep Section 230 immunity by styling allegations as misrepresentation claims. For example, courts have held that Section 230

---

[12] Snap Streaks are also protected speech under the First Amendment. *See, e.g.*, *In re Soc. Media*, 702 F. Supp. 3d at 837 ("There is no dispute that the content of the notifications themselves, such as awards, are speech. The Court conceives of no way to interpret plaintiffs' claim with respect to the frequency of the notifications that would not require defendants to change when and how much they publish speech. This is barred by the First Amendment.").

precludes plaintiffs from asserting a "theory of liability" that faults an application developer "for stating that it would maintain a 'safe and secure environment for its users' on the [a]pp but failing to do so." *See, e.g.*, *Grindr*, 128 F.4th at 1154 (underscoring that a "general statement that the [a]pp is 'designed to create a safe and secure environment for its users,' is not a specific promise, but a description of its moderation policy, and thus protected from liability under § 230."). To be sure, Section 230 "does not bar causes of action seeking to enforce contracts or promises unrelated to a [social media company]'s role as a publisher or speaker of third-party content," like when staff at a social media company personally promise to take down indecent profiles impersonating a specific person then fail to do so—or when a platform repeatedly makes promises to its users that it will unmask the identities of users sending harassing messages then fails to do so. *Id.* But that is rarely the case. *See Mann*, 2025 U.S. Dist. LEXIS 70065, at *6-7 ("Meta 'stat[ed] that their product is not to be used for any unlawful purposes, or assist someone else in usin[]g their products in such a way, or at the expense of the safety and well being of others or the integrity of the community.' Even assuming this language came from Meta's terms of service, it is not a 'promise' by Meta to take any particular action."); *Bogard v. TikTok Inc.*, 2025 WL 604972, at *10, 18 (N.D. Cal. Feb. 24, 2025) (unpublished) ("[F]ulfillment of the duty [p]laintiffs say [d]efendants undertook in making the alleged representations [about not allowing inappropriate or dangerous content on their applications] would necessarily require [d]efendants to change how they moderate content posted by third parties—i.e. to remove all reported videos.").

87.     Courts have appropriately enjoined state attorneys general from enforcing state laws in ways that would contravene Section 230.[13] For example, in *Comput. & Commc'ns Indus. Ass'n*, after plaintiffs showed that a state law's "monitoring-and-filtering requirements" constituted restrictions on speech that failed strict scrutiny, were unconstitutionally vague, and were preempted by Section 230, the court "preliminarily enjoin[ed] [Attorney General] Paxton from enforcing the monitoring-and-filtering provisions" of the state law. 747 F. Supp. 3d at 1044. Likewise, in *Backpage.com, LLC v. McKenna*, after plaintiffs showed that a state law criminalizing "the offense of advertising commercial sexual abuse of a minor" ran afoul of the First Amendment and Section 230, and violated the Dormant Commerce Clause, the court preliminarily enjoined prosecutors in the state of Washington from enforcing the state law. 881 F. Supp. 2d 1262, 1268, 1273 (W.D. Wash. 2012). As another example, in *Google LLC v. Equustek Sols. Inc.*, after plaintiffs showed that a court order requiring Google to take certain actions ran afoul of Section 230 and "threaten[ed] free speech on the global internet," the court preliminarily enjoined enforcement of that order. 2017 WL 5000834, at *3-4 (N.D. Cal. Nov. 2, 2017) (unpublished).[14]

88.     Such injunctions are in accord with *Morales v. Trans World Airlines, Inc.*, where the Supreme Court upheld an injunction against state attorneys general as the threatened enforcement of preempted state laws forced airlines to choose whether to continually violate the

---

[13] Courts have also enjoined legislative actions that would run afoul of Section 230. *See, e.g.*, *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *6-12 (D.N.J. Aug. 20, 2013) (unpublished) (enjoining the enactment of a state law after finding that the plaintiff was likely to succeed in asserting that the state law violated Section 230, the First Amendment, and the Commerce Clause).

[14] This was eventually converted into a permanent injunction. *See Google LLC v. Equustek Sols., Inc.*, 2017 WL 11573727, at *2 (N.D. Cal. Dec. 14, 2017) (unpublished).

state laws and risk huge liability or violate them once and "suffer the injury of obeying the law" while a test case was pending. 504 U.S. 374, 381 (1992).[15] They are also in accord with *Consumer Data Indus. Ass'n v. King*, where the Tenth Circuit found it "uncontroversial that restraining the [New Mexico] Attorney General from enforcing the allegedly preempted provisions of [a New Mexico statute] would go a long way toward providing relief for [the plaintiff]." 678 F.3d 898, 903 (10th Cir. 2012); *see also Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1264 (10th Cir. 2004) ("[T]his court has concluded that federal district courts have jurisdiction over actions seeking to enjoin the enforcement of a state regulation.").

89.     Accordingly, where a state official is asserting state law claims that are precluded by Section 230, injunctive relief is appropriate irrespective of whether Section 230 provides "immunity only from liability" or immunity from suit altogether. *Gen. Steel Domestic Sales, LLC v. Chumley*, 840 F.3d 1178, 1181 (10th Cir. 2016); *see* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").[16]

90.     For the foregoing reasons, absent prompt injunctive and declaratory relief, Snap and Snapchat users will be irreparably injured. *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at

---

[15] *See also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.").

[16] *Cf. Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) ("[S]ection 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and [time consuming] protracted legal battles."); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and ... is effectively lost if a case is erroneously permitted to go to trial.").

*7 (D. Nev. Apr. 9, 2025) (unpublished) ("A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." (collecting authority)). This irreparable injury is particularly salient when combined with the irreparable injuries outlined under Count One, in the form of nonrecoverable compliance costs and unjustified reputational damage.

91.    For the foregoing reasons, prompt injunctive and declaratory relief is also appropriate under Section 1983. *See KalshiEX, LLC v. Hendrick*, 2025 WL 1587682, at *5 (D. Nev. June 3, 2025) (unpublished).

**COUNT THREE**
**28 U.S.C. § 2201**
**DECLARATION OF THE PARTIES' RESPECTIVE RIGHTS**

92.    All preceding paragraphs are incorporated by reference as if set forth fully herein.

93.    This action presents an actual case or controversy concerning the Attorney General's threat of Defendants imminently suing Snap. Declaratory relief is therefore necessary and appropriate.

94.    Specifically, Snap is entitled to a declaration that: (a) Defendants are threatening to sue Snap for reasons that contravene the First and Fourteenth Amendments of the U.S. Constitution; (b) Defendants are threatening to sue Snap for reasons that contravene Section 230; (c) Snap's age verification related policies comply with COPPA; and (d) any related enforcement action by one or more Defendants is unconstitutional.

95.    COPPA is not addressed under prior counts, but is an important component of the declaratory relief sought here. By way of background, COPPA makes it "unlawful for an operator of a website or online service ***directed to children***, or any operator that has actual knowledge that

it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed" by the Federal Trade Commission ("FTC"). 15 U.S.C. § 6502(a)(1) (emphasis added).

96.    COPPA defines a "child" as an "individual under the age of 13." 15 U.S.C. § 6501(1).

97.    COPPA "does ***not*** require operators to ask the age of visitors." *See, e.g.*, *Complying with COPPA: Frequently Asked Questions*, Fed. Trade Comm'n (Jan. 2024), *available at* https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions. An operator "of a general audience site or service that chooses to screen its users for age in a neutral fashion," though, "may rely on the age information its users enter, even if that age information is not accurate." *See id.*

98.    Snap does not target "children under 13 as the primary audience" for Snapchat. *Cf. New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 516 F. Supp. 3d 1293, 1299 (D.N.M. 2021).

99.    To the contrary, Snap provides a neutral age gate in line with industry standards and FTC guidance that ***excludes*** registrants who indicate that they were born on a date that would make them ***under the age of 13***.

100.    To the extent that a parent, guardian, or other individual later becomes aware that a Snapchat user is under 13 years of age, they may report that user through Snap's support webpage or through Snapchat's in-app reporting features. Upon receiving such a report, Snap conducts an investigation into the user's account and, if it determines that the user is under 13 years old, Snap will lock and terminate the user's account from the platform and subsequently delete that user's data.

101.    The efficacy of the aforementioned approach is evidenced, in part, by the fact that over 50% of Snapchatters in the United States are at least 25 years old. *See 2024 In A Snap*, Snap Newsroom (last accessed June 17, 2025), *available at* https://newsroom.snap.com/2024-in-a-snap.

102.    In light of the above, Snapchat is not directed at children and Snap does not have actual knowledge that it is in possession of minors' data. Accordingly, Snap is entitled to a declaratory judgment that it is not in violation of COPPA. *See Initiative & Referendum Inst. v. Walker*, 161 F. Supp. 2d 1307, 1311 (D. Utah 2001).[17]

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court:

(a)    Immediately enter a temporary restraining order precluding any Defendants—and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of any injunction—from filing suit against Snap, or launching a new investigation into Snap, for reasons related to:

   i.    Age verification;

   ii.    Parental consent;

   iii.    Implementation of other safety features;

---

[17] To the extent Defendants claim that Utah law imposes broader requirements than COPPA and therefore necessitates the use of age-verification—or other age-based restrictions on access to an application—such claims: (a) are preempted by COPPA, *see New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1121 (D.N.M. 2020) ("COPPA preempts state law that treats like conduct differently."); and (b) must also be rejected as a violation of the same constitutional protections that prevent Defendants from imposing age-restriction and age-verification requirements on Snap.

  iv.  Representations, or a lack thereof, about the safety and security of Snapchat for its users;

  v.  Illicit content posted by third parties on Snapchat;

  vi.  Information generated during user interactions with My AI;

  vii.  Ephemeral messaging;

  viii.  Snap's recommendation algorithm; and

  ix.  Snap Streaks.

(b)  Preliminarily and permanently enjoin any Defendants—and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of any injunction—from filing suit against Snap, or launching a new investigation into Snap, for reasons related to:

  i.  Age verification;

  ii.  Parental consent;

  iii.  Implementation of other safety features;

  iv.  Representations, or a lack thereof, about the safety and security of Snapchat for its users;

  v.  Illicit content posted by third parties on Snapchat;

  vi.  Information generated during user interactions with My AI;

  vii.  Ephemeral messaging;

  viii.  Snap's recommendation algorithm; and

  ix.  Snap Streaks.

(c)  Declare that:

      i.        Defendants are threatening to sue Snap for reasons that contravene the First and Fourteenth Amendments of the U.S. Constitution;

      ii.     Defendants are threatening to sue Snap for reasons that contravene Section 230;

     iii.    Snap's age verification related policies comply with COPPA; and

     iv.    Any related enforcement action by one or more Defendants is unconstitutional.

(d)    Award to Plaintiff all reasonable costs and attorneys' fees in this action pursuant to 42 U.S.C. § 1988 and any other applicable law.

(e)    Provide for such other and further relief, including all relief that is available under 42 U.S.C. § 1983, as the Court deems just and proper.

DATED this 19th day of June, 2025.      Respectfully Submitted,

**SNELL & WILMER LLP**

By:   /s/ *Matthew L. Lalli*
       Matthew L. Lalli
       Annika L. Jones

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kimberly O. Branscome(*pro hac vice to be filed*)
Jonathan Tam (*pro hac vice to be filed*)
Matthew P. Steinberg (*pro hac vice to be filed*)

*Attorneys for Plaintiff Snap Inc.*