Matthew L. Lalli (6105)
Annika L. Jones (16483)
**SNELL & WILMER LLP**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone:    (801) 257-1900
Facsimile:    (801) 257-1800
mlalli@swlaw.com
aljones@swlaw.com

Kimberly O. Branscome (*pro hac vice to be filed*)
Jonathan Tam (*pro hac vice to be filed*)
Matthew P. Steinberg (*pro hac vice to be filed*)
**PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP**
2029 Century Park East
Los Angeles, CA 90067-3006
Telephone:    (310) 982-4350
Facsimile:    (310) 943-1770
kbranscome@paulweiss.com
jtam@paulweiss.com
msteinberg@paulweiss.com

*Attorneys for Plaintiff Snap Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SNAP INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DEREK E. BROWN, in his official capacity as Attorney General of Utah,<br><br>KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce,<br><br>Defendants. | **MOTION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>**Case No.  2:25-cv-490**<br><br>**Judge    Jill N. Parrish** |

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .......................................................................................................... 1

STATEMENT OF RELEVANT FACTS .................................................................... 5

    I.    SNAP INC. & SNAPCHAT ................................................................................ 5

    II.   UTAH'S UNCONSTITUTIONAL ATTEMPTS TO REGULATE SOCIAL MEDIA ............................ 6

    III.  UTAH'S ATTEMPTS TO ENFORCE REQUIREMENTS OF UNCONSTITUTIONAL LAWS .............. 9

GOVERNING STANDARD ...................................................................................... 11

STATEMENT OF JUSTIFICATION FOR EX PARTE PROCEEDING .......................... 13

ARGUMENT .............................................................................................................. 14

    I.    SNAP IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ......................... 14

        A.   *Snap's Activities Are Protected By The First And Fourteenth Amendments Of The United States Constitution* .................................... 14

        B.   *The Communications Decency Act Immunizes The Conduct At Issue* .......................... 18

        C.   *Declaratory Relief Is Necessary And Appropriate* ...................... 20

    II.   SNAP FACES A SUBSTANTIAL THREAT OF IRREPARABLE INJURY ...................... 21

    III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION .................... 23

    IV.  A BOND IS UNNECESSARY ........................................................................ 24

CONCLUSION .......................................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*303 Creative v. Elenis*,
    143 S. Ct. 2298 (2023) ..................................................................................15

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003) ...........................................................................18

*Am. C.L. Union v. Johnson*,
    4 F. Supp. 2d 1029 (D.N.M. 1998) ...............................................................16

*Am. C.L. Union v. Johnson*,
    194 F.3d 1149 (10th Cir. 1999) .....................................................................18

*Am. Trucking Ass'n v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009 ........................................................................24

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) ......................................................................................16

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) ...............................................................21, 22

*N.M. ex rel. Balderas v. Tiny Lab Prods.*,
    516 F. Supp. 3d 1293 (D.N.M. 2021) ...........................................................21

*Barrett v. Rosenthal*,
    146 P.3d 510 (Cal. 2006) ..............................................................................19

*Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*,
    206 F.3d 980 (10th Cir. 2000) .................................................................19, 20

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) .........................................................................24

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ................................................................................15, 17

*Cenergy Corp. v. Bryson Oil & Gas P.L.C.*,
    657 F. Supp. 867 (D. Nev. 1987) .................................................................13

*Chamber of Commerce of U.S. v. Edmondson,*
  594 F.3d 742 (10th Cir. 2010) .................................................................23

*Climate United Fund v. Citibank, N.A.,*
  2025 WL 1567633 (D.D.C. Mar. 31, 2025)..............................................4

*Cloud Peak Energy Inc. v. United States Dep't of Interior,*
  415 F. Supp. 3d 1034 (D. Wyo. 2019).....................................................23

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
  747 F. Supp. 3d 1011 (W.D. Tex. 2024)..............................................2, 18

*Consumer Data Indus. Ass'n v. King,*
  678 F.3d 898 (10th Cir. 2012) ...................................................................3

*Coquina Oil Corp. v. Transwestern Pipeline,*
  825 F.2d 1461 (10th Cir. 1987) ...............................................................24

*Davis v. Mineta,*
  302 F.3d 1104 (10th Cir. 2002) ...............................................................12

*De Jonge v. Oregon,*
  299 U.S. 353 (1957).................................................................................17

*Doe (K.B.) v. Backpage.com, LLC,*
  768 F. Supp. 3d 1057 (N.D. Cal. 2025) ...................................................20

*Doe No. 1 v. Backpage.com, LLC,*
  817 F.3d 12 (1st Cir. 2016)......................................................................20

*Doe v. Grindr Inc.,*
  128 F.4th 1148 (9th Cir. 2025) ...........................................................19, 20

*Doe v. Snap, Inc.,*
  2022 WL 2528615 (S.D. Tex. July 7, 2022)............................................20

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
  100 F.4th 1251 (10th Cir. 2024) ..............................................................14

*Elrod v. Burns,*
  427 U.S. 347 (1976)..................................................................................21

*First Tech. Safety Sys., Inc. v. Depinet,*
  11 F.3d 641 (6th Cir. 1993) ......................................................................13

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019)..........................................................................19

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
    916 F.3d 792 (10th Cir. 2019) ...................................................................21

*Fw-Co, Inc. v. Schulz*,
    2025 WL 588350 (D. Colo. Feb. 24, 2025) ................................................4

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .................................................................23

*Hodgkins ex rel. Hodgkins v. Peterson*,
    355 F.3d 1048 (7th Cir. 2004) ...................................................................15

*Initiative & Referendum Inst. v. Walker*,
    161 F. Supp. 2d 1307 (D. Utah 2001)........................................................21

*KalshiEX, LLC v. Hendrick*,
    2025 WL 1073495 (D. Nev. Apr. 9, 2025).......................................3, 23, 24

*Kikumura v. Hurley*,
    242 F.3d 950 (10th Cir. 2001) ...................................................................22

*L.W. v. Snap Inc.*,
    675 F. Supp. 3d 1087 (S.D. Cal. 2023)..................................................19, 20

*Lovesac Co. v. www.lovessac.com*,
    2022 WL 504192 (D. Utah Feb. 18, 2022) ..............................................4, 22

*M.P. v. Meta Platforms Inc.*,
    127 F.4th 516 (4th Cir. 2025) ....................................................................20

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*,
    312 U.S. 270 (1941)....................................................................................21

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)..............................................................................15, 17

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)......................................................................................3

*Nunez v. Nunez*,
    2013 WL 5230614 (D. Utah 2013) .............................................................12

*Pac. Frontier v. Pleasant Grove City*,
  414 F.3d 1221 (10th Cir. 2005) ........................................................................23

*Packingham v. North Carolina*,
  582 U.S. 98 (2017).......................................................................................16, 17

*PSINet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004) ........................................................................16, 18

*Reno v. Am. C.L. Union*,
  521 U.S. 844 (1997)............................................................................................15

*Rocky Mountain Gun Owners v. Polis*,
  685 F.Supp.3d 1033 (D. Colo. 2023)..................................................................24

*Roda Drilling Co. v. Siega*l,
  2008 WL 4056229 (N.D. Okla. Aug. 11, 2008) ..................................................14

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) ..........................................................................24

*S. Utah Drag Stars v. City of St. George*,
  677 F. Supp. 3d 1252 (D. Utah 2023)............................................................18, 24

*Seattle Pacific Univ. v. Ferguson*,
  104 F.4th 50 (9th Cir. 2024) ...............................................................................14

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
  702 F. Supp. 3d 809 (N.D. Cal. 2023) .................................................................19

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)............................................................................................17

*Thomas v. Collins*,
  323 U.S. 516 (1945)............................................................................................17

*Kansas v. United States Dep't of Educ.*,
  739 F. Supp. 3d 902 (D. Kan. 2024)....................................................................23

*Utah Div. of Consumer Protection v. Meta Platforms, Inc.*,
  No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023) .......................................3, 11

*Utah Div. of Consumer Protection v. TikTok Inc.*,
  No. 240904292 (3d Judicial Dist. Ct. June 3, 2024).........................................3, 11

*Utah Vapor Bus. Ass'n Inc. v. Utah*,
　2025 WL 1201731 (D. Utah Mar. 24, 2025) .........................................................................23

*Valle del Sol v. Whiting, Inc.*,
　732 F.3d 1006 (9th Cir. 2013) ............................................................................................24

*Wilson v. Midway Games, Inc.*,
　198 F. Supp. 2d 167 (D. Conn. 2002) .................................................................................17

*Zeran v. Am. Online, Inc.*,
　129 F.3d 327 (4th Cir. 1997) ..............................................................................................19

*Zoulek, et al. v. Hass, et al.*,
　No. 2:24-cv-00031 (D. Utah Jan. 12, 2024) ..........................................................................7

**Statutes**

15 U.S.C. § 6504 ........................................................................................................................9

28 U.S.C. § 1746 ......................................................................................................................12

28 U.S.C. § 2201(a) .................................................................................................................21

47 U.S.C. § 230 ..................................................................................................................*passim*

Children's Online Privacy Protection Act ..................................................................9, 10, 21

Communications Decency Act § 230 .........................................................................................1

Utah Minor Protection in Social Media Act of 2024 ..............................................................1, 7

Utah Social Media Regulation Act of 2023 ..............................................................................7

**Rules**

Fed. R. Civ. P. 65(b) ........................................................................................................12, 13, 24

Plaintiff Snap Inc. hereby files this Motion for An *Ex Parte* Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Motion").

Snap seeks immediate, temporary injunctive relief on an *ex parte* basis to preserve the status quo and prevent the threatened actions of Utah Attorney General Derek E. Brown and of Utah Director of the Division of Consumer Protection Katherine Hass (collectively "Defendants"), who effectively seek to circumvent this Court's prior enjoinder of the Utah Minor Protection in Social Media Act of 2024, and to impose requirements on Snap through civil litigation that violate the United States Constitution and Section 230 of the Communications Decency Act.

Absent such relief, Defendants can take such actions as soon as ***Saturday, June 21, 2025,*** and finally try to make good on Utah's efforts to impose its own subjective views—about who can access social media, how people can go about accessing social media, and what content is displayed when people are accessing social media—on social media platforms without any regard for the laws or Constitution of the United States.

## **INTRODUCTION**

In *NetChoice, LLC v. Reyes*, this Court preliminarily enjoined the Utah Minor Protection in Social Media Act of 2024, which required social media companies to, among other things, "implement an age assurance system to determine whether a current or prospective Utah account holder ... is a minor"—with the system being "reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%"—and to abide by special rules with respect to Utah minors' accounts. 748 F. Supp. 3d 1105, 1120, 1130 (D. Utah 2024), *appeal filed*, No. 24-4100 (10th Cir. 2024). This Court explained that the Act likely violated the First Amendment because its operative

1

provisions—age verification and age-related restrictions—imposed unjustified, content-based restrictions on social media companies' speech. *Id.* at 1120-21.

Defendants are now resorting to civil litigation as a means to impose age verification requirements and age-related restrictions that this Court determined were likely in violation of the Constitution. After stating that he "wants to 'ratchet up what [the Attorney General's Office is] doing' on social media lawsuits,"[1] the Attorney General has formally threatened an imminent lawsuit against Snap because of purportedly inadequate age verification requirements and age-related "guardrails." The Attorney General's threatened action is an attempted end-run around this Court proscribing Defendants' desired methods of age verification, and is contrary to the First Amendment.[2]

If that were not enough, the Attorney General has also stated his intent to include certain claims under the Utah Consumer Sales Practices Act ("UCSPA") in Defendants' impending lawsuit, which will invariably contravene the "broad immunity" provided to Snap under Section 230. *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1042 (W.D. Tex. 2024) (citation omitted); *see also* 47 U.S.C. § 230(a)(3), (b)(2) (noting that such immunity is intended to ensure that the internet remains a "forum" for free-ranging intellectual inquiry and diverse political and cultural discourse, and a "vibrant and competitive free market ... unfettered by Federal or State

---

[1] *See* Brigham Tomco, *To Rebuild Trust, Utah's Next Attorney General Wants to Take His Office Down to the Studs*, Deseret News (Jan. 3, 2025), *available at* https://www.deseret.com/politics/2025/01/03/attorney-general-derek-brown-wants-to-return-trust-to-the-office/.

[2] Though Defendants threaten litigation against Snap under a different statute than the one enjoined as likely unconstitutional in *Reyes*, the effect of the threatened litigation here is the same.

regulation"). Indeed, Defendants have historically predicated their UCSPA claims against social media companies on allegations that they fail to adequately identify users' ages with its age-gating, "serve[] content to children that is not appropriate for their age," facilitate illicit acts, make misrepresentations in connection with the same, and incorporate a variety of other purportedly problematic features into their apps. *See, e.g.*, Notice of Filing of Unsealed Complaint, *Utah Div. of Consumer Protection v. Meta Platforms, Inc.*, No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023); Complaint and Jury Demand, *Utah Div. of Consumer Protection v. TikTok Inc.*, No. 240904292 (3d Judicial Dist. Ct. June 3, 2024). And it is Snap's understanding that, in a lawsuit against Snap, Defendants will allege similar violations of the UCSPA. Yet, such allegations run headlong into Section 230.

Under these circumstances, the Court should exercise its power to enjoin state actors from initiating civil actions that contravene the Constitution and/or laws of the United States. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-84 (1992); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012). As explained more fully below, Snap is likely to succeed on the merits of its claims, and irreparable injury would be wrought by Defendants' legally improper and impermissible civil enforcement action that is otherwise set to be filed ***as soon as Saturday, June 21, 2025***. "The loss of First Amendment freedoms" to Snap and Snapchat users "unquestionably constitutes irreparable injury," as does the nonrecoverable compliance costs Snap would have to expend to implement the unconstitutional features called for by Defendants, the unjustified reputational damage caused by the Defendants, and the costs and burdens associated with "prosecution for a state violation that conflicts with federal law." *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *7 (D. Nev. Apr. 9, 2025) (unpublished) (collecting authority); *see also*

*Lovesac Co. v. www.lovessac.com*, 2022 WL 504192, at *4 (D. Utah Feb. 18, 2022) (unpublished).

Accordingly, Snap seeks to enjoin Defendants from violating Snap's rights under the laws and Constitution of the United States. Specifically, Snap seeks an immediate temporary restraining order—and a subsequent injunction—precluding any Defendants (and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of any injunction) from filing suit against Snap, or launching a new investigation into Snap, for reasons related to: (a) age verification; (b) parental consent; (c) implementation of other safety features; (d) representations, or a lack thereof, about the safety and security of Snapchat for its users; (e) illicit content posted by third parties on Snapchat; (f) information generated during user interactions with My AI; (g) ephemeral messaging; (h) Snap's recommendation algorithm; and (i) Snap Streaks. Snap respectfully requests that the Court provide its requested relief for a period of fourteen (14) days, unless otherwise extended to prevent irreparable harm while the Court is considering whether to enter a preliminary injunction pursuant to a show cause order, as is routine practice in this circuit and others.[3]

To be clear, Snap has no higher priority than the safety of Snapchatters, over 90% of whom say they feel comfortable, happy, and connected with friends and family when using the platform. In the past few years alone, Snap has invested hundreds of millions of dollars into moderation teams, trust and safety teams, and law enforcement teams, which has resulted in a doubling of the

---

[3] *See, e.g.*, *Fw-Co, Inc. v. Schulz*, 2025 WL 588350, at *6 (D. Colo. Feb. 24, 2025) (unpublished) ("Here, the Court finds good cause to extend the TRO, up to and including the determination of the forthcoming motion for preliminary injunction, with the explicit recognition that expedited discovery and a more fulsome record could tip the Court's consideration regarding the entry of a longer preliminary injunction in either Party's favor."); *Climate United Fund v. Citibank, N.A.*, 2025 WL 1567633 (D.D.C. Mar. 31, 2025) (unpublished) (similar).

size of its Trust and Safety team and a tripling of the size of its Law Enforcement Operations team since 2020. However, as the developer of a platform meant to foster constitutionally protected speech and expression, Snap opposes attempts like those threatened by Defendants to impose unduly restrictive, technologically infeasible, and/or speech stifling requirements on its communications platform.

<u>**STATEMENT OF RELEVANT FACTS**</u>

Below are the facts that are relevant to the relief requested in this Motion. Additional facts about Snap and Snapchat are set forth in the Complaint, for further background.

**I.    Snap Inc. & Snapchat**

Snap's flagship application is Snapchat, a camera and communications service that allows users to communicate with friends and family using text, photos, and short videos. *See* **Exhibit 1** (Declaration of Nona Yadegar ("Yadegar Decl.")) ¶ 3.[4] To create a Snapchat account, you must be at least 13 years old. *Id.* ¶ 5.

Snapchat is typically used for communications between small groups of people who already know each other in real life. *Id.* ¶ 3. Snapchat opens to a camera rather than a feed of content, and its best-known feature—the 'Snap'—is used to create and send photo and video messages between friends, which by default disappear from the service after they are opened. *Id.* ¶ 4. Just as friends talking in person do not typically record their conversations, Snapchat does not record user interactions by default, and instead affords users a digital way "to show a more authentic, unpolished, and spontaneous side of themselves," without permanent and publicly

---

[4] *See also What is Snapchat?*, Snap Parents (last accessed June 17, 2025), *available at* https://parents.snapchat.com/about-snapchat.

viewable posts. *See id.*

Some of Snapchat's most well-known features are the "Stories" and "Spotlight." Since October 2013, users are able to compile photos and videos into "Stories" which are then available for 24 hours, and are by default only viewable by a user's friends. *Id.* "Spotlight" is a newer feature that Snap introduced which allows users to make videos that any Snapchat user can view, not just a user's contacts. *Id.* Snap invests in updating and refining Snapchat's features, and developing new ones, to create a better experience for Snapchat's users. Such investments are significant, in terms of "budget, resources, and staff," as making changes to Snapchat's source code takes time and teamwork. *See id.* ¶¶ 9-10.

Snap takes actions, and takes precautions, to support minors' safety while using the service and while out engaging with their communities. *Id.* ¶ 6. For example, minors can only receive direct messages from users with whom they are already friends on the platform or already have in their phone's contacts. *Id.* In addition, Snap offers parents ways to gain insight into their teens' use of the platform. Snapchat's "Family Center," a suite of parental tools which was launched in 2022, enables a parent or guardian to see which friends their teen has been recently communicating with on Snapchat, view their list of friends, report abuse, and limit their teen's ability to view sensitive content in Stories and Spotlight (above and beyond the limitations already set by Snap's Community Guidelines for all users across the platform). *See id.* ¶ 7. Family Center is designed to mirror the oversight that parents have over their teens' actions in real life. *Id.*

## II.    Utah's Unconstitutional Attempts To Regulate Social Media

Over the past two years, the Utah Legislature has enacted two laws aimed at social media platforms.

First, the Utah Legislature enacted the Utah Social Media Regulation Act of 2023 (Utah Code § §13-63-101 *et seq.*) (the "2023 Act"). This first-of-its-kind law included: (a) a parental consent requirement for minors to create or access social media accounts; (b) mandatory age verification for all Utah social media account holders; (c) restrictions on social media advertising, targeted content, and data collection for minors; (d) a curfew prohibiting minors from accessing social media websites between 10:30pm and 6:30am; and (e) design requirements to prevent features that could cause "addiction" in minors.

Shortly thereafter, NetChoice, a trade association that represents social media and internet companies (including Snap), filed a lawsuit challenging the 2023 Act's constitutionality on the grounds that it violated the First Amendment and was impermissibly vague. *See Reyes*, 748 F. Supp. 3d at 1116. Additionally, a second lawsuit challenging the constitutionality of the 2023 Act was filed by minors, adults, and a youth-led organization who use social media platforms to learn, express themselves, and interact with others. *See Zoulek, et al. v. Hass, et al.*, No. 2:24-cv-00031 (D. Utah Jan. 12, 2024). Shortly after these lawsuits were filed, and prior to the 2023 Act taking effect, the Utah legislature delayed the effective date so it would have time to "repeal and replace" the 2023 Act altogether. *See* Defendant's Motion for Amended Scheduling Order, at 2, *NetChoice, LLC v. Reyes*, No. 2:23-cv-00911 (D. Utah Jan. 19, 2024), ECF No. 39.

Undeterred, the Utah Legislature then enacted the Utah Minor Protection in Social Media Act of 2024 (Utah Code §§ 13-71-101 et seq.) (the "2024 Act"). *See Reyes*, 748 F. Supp. 3d at 1116. It had two component parts:

- The first part of the 2024 Act required social media companies to "implement an age assurance system to determine whether a current or prospective Utah account

holder . . . is a minor," *see id.* (quoting Utah Code § 13-71-201(1)), with the system being "reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%," *see id.* (quoting Utah Code § 13-71-101(2));; and, in conjunction, it also required social media companies to "implement a review process allowing account holders to appeal the account holder's age designation by submitting documentary evidence to establish the account holder's age range," with the social media company "review[ing] evidence submitted by the account holder and mak[ing] a determination within 30 days of submission of the evidence," *see id.* at 1114 (quoting Utah Code § 13-71-201(3)(a).

- The second part of the 2024 Act subjected social media companies to special rules with respect to Utah minors' accounts. *Id.* For example, it required social media companies to "set default privacy settings to prioritize maximum privacy" in specific ways that it enumerated, unless a social media company "first obtain[ed] verifiable parental consent." *Id.* (quoting Utah Code §§ 13-71-101(5) and 13-71-204(1).

NetChoice filed an amended complaint alleging that the 2024 Act is unconstitutional for many of the same reasons as the 2023 Act, and also as a result of new flaws in the 2024 Act—such as the regulation of who minors can speak with absent parental consent. *Id.* at 1114-15. NetChoice then sought to preliminarily enjoin the 2024 Act. *Id.* On September 10, 2024, this Court granted NetChoice's motion for a preliminary injunction, finding NetChoice was substantially likely to succeed on its First Amendment claims. Specifically, this Court held that NetChoice was

substantially likely to succeed in arguing that "the entire [2024] Act facially violates the First Amendment because the Act's operative provisions … impose[] unjustified, content-based restrictions on social media companies' speech." *Id.* at 1120, 1130.

## III.    Utah's Attempts To Enforce Requirements Of Unconstitutional Laws

In 2023, the Utah Division of Consumer Protection issued a subpoena to Snap. In the subpoena, the Division of Consumer Protection claimed it had reason to believe that Snap was engaging in an act or practice that violated the UCSPA. *See* Yadegar Decl. ¶ 12. The subpoena called upon Snap to produce numerous documents, including documents related to Snap's age verification processes and other features integral to how users communicate with friends and family (*e.g.*, ephemeral messages, Snap Streaks, My AI, and Snap's recommendation algorithm). *Id.* The subpoena stated that failure to comply could result in a contempt or civil enforcement proceedings. *Id.*

In January of 2025, after complying with the 2023 subpoena, Snap received another subpoena. This subpoena was issued by the Attorney General's Office, pursuant to 15 U.S.C. § 6504, and stated that the Attorney General's Office had reason to believe Snap was engaging in an act or practice that violated the Children's Online Privacy Protection Act ("COPPA"). *See id.* Like the previous subpoena, the 2025 subpoena stated that Snap's "failure to comply" could result in a contempt or civil enforcement action. *Id.*

In accordance with the Attorney General stating that he "wants to 'ratchet up what [the Attorney General's Office is] doing' on social media lawsuits,"[5] the Attorney General sent Snap

---

[5] *See* Brigham Tomco, *To rebuild trust, Utah's next attorney general wants to take his office down to the studs*, Deseret News (Jan. 3, 2025), *available at*

an Enforcement Letter dated May 22, 2025. *See* ECF No. 1-2. The Enforcement Letter explains that the Office of the Attorney General received a referral from the Utah Division of Consumer Protection related to Snap's business practices, which the Division believes violate the UCPA and COPPA. *Id.*

More specifically, the Enforcement Letter asserts that Snap has: (a) violated the UCPA because Snap's internal documents supposedly "confirm that [Snap] not only shares conversations that users have with the My AI feature with OpenAI, but that they are stored by OpenAI for up to thirty days—a third party that is not identified in customer sign-up pages, pop-up disclaimers, the privacy policy, or in related privacy and service provider pages"; (b) violated the UCPA as to all users because there is purportedly "no clear notice or ability to opt out of the processing of sensitive data which My AI collects when default settings are enabled"; and (c) also violated the UCPA and COPPA because of purportedly "inadequate age gate and deficient guardrails to prevent access by those under the age of thirteen" and the "parents of underage users [not being] given [an] opportunity to affirmatively consent to use of the technology. *See id.* The Enforcement Letter states that it "constitutes the requisite notice under [Utah Code] section 13-61-402," which mandates that the Attorney General provide notice at least 30 days prior to initiating a civil enforcement action. *See id.*

During a discussion with Snap shortly thereafter, the Attorney General's Office informed Snap that it also plans to file the civil lawsuit against Snap under the UCSPA. *See* Yadegar Decl. ¶ 14. In the State's two pending lawsuits against TikTok, and the State's pending lawsuit against

---

https://www.deseret.com/politics/2025/01/03/attorney-general-derek-brown-wants-to-return-trust-to-the-office/.

Meta, Defendants have asserted claims under the UCSPA. Among other things, the State's UCSPA claims concern purported issues with age verification processes, age "appropriate" content, facilitating illicit acts, making misrepresentations about an app's safety and security in connection with the same, and a variety of other features that are integral to how users communicate and receive content.[6]

Changing fundamental aspects of Snapchat at Defendants' behest—including how Snapchat's users go about accessing content and what content they are exposed to—would alter core components of the app, and would consume substantial "budget, resources, and staff" *See id.* ¶¶ 9-11. Indeed, implementing different age verification requirements and/or age-related "guardrails" would require alterations to Snapchat's code, and would "consume substantial budget, resources, and staff." *Id.* Changing fundamental aspects of Snapchat at Defendants' behest would also impede users'—minors and adults alike—access to Snap's services and their enjoyment of the ability to communicate with friends and family, and make those services less helpful to users. *See id.*

## GOVERNING STANDARD

Under Federal Rule of Civil Procedure Rule 65(b), a court may issue a temporary

---

[6] *See, e.g.*, Complaint and Jury Demand, at ¶¶ 127-130, *Utah Div. of Consumer Protection v. TikTok Inc.*, No. 240904292 (3d Judicial Dist. Ct. June 3, 2024) ("Over the years, TikTok has publicly advertised new tools to help moderate and limit distribution of certain material …. Yet all of TikTok's age-gating policies are plagued by a fundamental flaw: TikTok allows underage users to falsify their birthday and does nothing to verify their stated age. Because the company fails to identify users' ages, it exposes children to content and themes that it knows are inappropriate or even dangerous."); Notice of Filing of Unsealed Complaint, at ¶ 148, *Utah Div. of Consumer Protection v. Meta Platforms, Inc.*, No. 230908060 (3d Judicial Dist. Ct. Nov. 27, 2023) ("Despite its public representations about prioritizing user safety and shielding children from inappropriate content, Meta knows that it serves content to children that is not appropriate for their age.").

restraining order without notice to the adverse party only if: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b); *see also* 28 U.S.C. § 1746 (permitting unsworn declarations under penalty of perjury in lieu of affidavits).

In the Tenth Circuit, the standard given in Rule 65 has been interpreted as a four-element test, which engenders a temporary restraining order when the movant establishes the following four elements: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the [temporary restraining order] is used; (3) that the threatened injury outweighs the harm that the [temporary restraining order] may cause the opposing party; and (4) that the [temporary restraining order], if issued, will not adversely affect the public interest." *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002). The standard for granting a temporary restraining order is identical to the standard for granting a preliminary injunction. *Nunez v. Nunez*, 2013 WL 5230614, at *2 (D. Utah 2013) (unpublished).

## STATEMENT OF JUSTIFICATION FOR EX PARTE PROCEEDING

In accordance with Rule 65(b)(1)(B) of the Federal Rules of Civil Procedure, the undersigned counsel for Snap hereby certifies that no notice was given to Defendants concerning this Motion. Giving notice to Defendants of this Motion would futile because Snap has alleged specific facts, by way of a declaration and other competent evidence, that clearly show immediate and irreparable injury, loss, or damage will result to Snap before the adverse party can be heard in opposition.

Snap has reasonable cause to believe that giving Defendants notice of this Motion will spur Defendants to file suit against Snap before this Court is able to enjoin Defendants from doing so;. After receiving the Enforcement Letter, Snap (through its counsel) and the Attorney General's Office discussed the civil lawsuit that Defendants intend to file imminently. *See generally* Yadegar Decl. ¶ 14. As noted, any such suit is impermissible under the laws and/or Constitution of the United States, and will cause Snap to sustain irreparable injuries (as outlined above). Even in far less consequential circumstances, courts have recognized that is "proper to enter the TRO without notice, [if] giving notice itself may defeat the very purpose for the TRO." *See, e.g.*, *Cenergy Corp. v. Bryson Oil & Gas P.L.C.*, 657 F. Supp. 867, 870 (D. Nev. 1987) ("[T]he language of the TRO itself indicated to the [c]ourt that notice of the TRO might 'tip the hand' of Cenergy to Bryson. So alerted to the imminent entry of restraint against it, Bryson could then have proceeded to file suit in another district or state court before the TRO could have taken effect."); *see also, e.g.*, *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) (recognizing that an *ex parte* order may be appropriate when the adverse party, if given notice of the order, is likely to take action that "would render fruitless further prosecution of the action").

For these and other reasons explained more fully herein, the entry of the requested relief without first giving notice to Defendants is justified.

## ARGUMENT

## I.    Snap Is Likely To Succeed On The Merits Of Its Claims

Where a plaintiff seeks injunctive relief "and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits of one of the claims," *RoDa Drilling Co. v. Siega*l, 2008 WL 4056229, at *5 (N.D. Okla. Aug. 11, 2008) (citation omitted); however, "[i]f the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable," *see Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1267 (10th Cir. 2024). As outlined below, the State's threatened lawsuit violates multiple aspects of the laws and Constitution of the United States and, as such, there is a strong basis to issue the requested relief .[7]

### A.    Snap's Activities Are Protected By The First And Fourteenth Amendments Of The United States Constitution

As incorporated against the States, the First Amendment's Free Speech and Free Press Clause provide that governments "shall make no Law. . . abridging the Freedom of Speech, or of the Press." *See* U.S. Const. amend. I. Among other things, the Free Speech and Free Press Clauses

---

[7] There is no basis for the Court to abstain from exercising jurisdiction, as "the period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its First Amendment challenges in federal court," if the litigant so chooses, since "if this time is never appropriate, any opportunity for federal adjudication of federal rights will be lost." *See Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 64 (9th Cir. 2024) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989)).

help protect the following actions from government interference: (a) "publish[ing]" protected speech, *see Reno v. Am. C.L. Union*, 521 U.S. 844, 852 (1997); (b) "disseminat[ing]" protected speech, *see 303 Creative v. Elenis*, 143 S. Ct. 2298, 2316 (2023); and (c) "creating, distributing, [and] consuming" protected speech, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011).

This constellation of First Amendment protections extends to all manner of private entities, With respect to social media companies, such protections most often extend to "the speech [they] engage in when they make decisions about how to construct and operate their platforms." *See Reyes*, 748 F. Supp. 3d at 1120; *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024) (underscoring that social media companies "mak[ing] choices about what third-party speech to display and how to display it" is protected by the First Amendment). In the circumstances giving rise to this suit, First Amendment protections extend to how and when users can access Snapchat, as well as the content users see when accessing Snapchat. If Defendants are allowed to file suit against Snap due to purportedly inadequate age verification requirements and age-related "guardrails" on Snapchat—and/or information generated during user interactions with My AI— then Defendants will contravene the First Amendment rights of Snap and Snapchatters alike, for the following reasons.

***First***, by asserting that Snapchat has legally insufficient age verification and age gating, such that Snap cannot avoid civil liability unless it implements a "verifiable parental consent" feature that pops up prior to accessing Snapchat, *see* **Exhibit 1**, Defendants are attempting "[t]o condition the exercise of First Amendment rights on the willingness of an adult to chaperone." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1064 (7th Cir. 2004). It is black letter law that this is unconstitutional. *See id.*; *see also Brown*, 564 U.S. at 802 ("[P]unishing third parties

for conveying protected speech to children *just in case* their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority."); *id.* at 795 n.3 (underscoring that the government lacks "the power to prevent children from hearing or saying anything without their parents' prior consent").

**Second**, and relatedly, by asserting that Snapchat has legally insufficient age verification and age gating, such that Snap cannot avoid civil liability unless it implements more stringent measures that will also deter legal use of Snapchat, *see* **Exhibit 1**, Defendants are "barring access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge," *see Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). This is particularly problematic because it impacts both adults and teenagers. *See Am. C.L. Union v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998) (holding that mandatory age verification "violates the First and Fourteenth Amendments of the United States Constitution because it prevents people from communicating and accessing information anonymously"), *aff'd*, 194 F.3d 1142 (10th Cir. 1999); *see also Ashcroft v. Free Speech Coal*, 535 U.S. 234, 236, 252 (2002) ("Speech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it."); *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004) (an age-verification requirement using credit card numbers "creates First Amendment problems of its own" because "many adults may be unwilling to provide their credit card number online" and "[s]uch a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card").

**Third**, by curtailing how and when users can access Snapchat—as well as the content users

see when accessing Snapchat—Defendants are unconstitutionally impeding Snapchat users' First Amendment right to "peaceably assemble" to engage in otherwise lawful speech activities with whomever they choose, *see Thomas v. Collins*, 323 U.S. 516, 530-40 (1945), given that social-media applications like Snapchat have become the "modern public square," *see Packingham*, 582 U.S. at 107. The United States is built on the idea that the right of peaceable assembly is a right equally fundamental to those of free speech and free press, and the First Amendment does not yield to the State's improper attempt to limit who can access Snapchat and how they do so.  *See De Jonge v. Oregon*, 299 U.S. 353, 364-65 (1957) ("The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score.").

*Fourth*, by taking issue with information generated during user interactions with My AI, Defendants are seeking to impose liability in contravention of the First Amendment. It is well settled that "the creation and dissemination of information are speech for First Amendment purposes," *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 553 (2011); *see also Brown*, 564 U.S. at 790, such that the curation of training data for—and post-training interventions to directly engineer the behavior of—a generative artificial intelligence tool engender First Amendment protections for that tool's speech, *see Moody*, 603 U.S. at 729-30; *see also Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 181 (D. Conn. 2002).

These four separate, but in some cases related, reasons show that Defendants' threat of an imminent lawsuit strikes at the heart of the First Amendment—and that Snap is substantially likely to prevail in vindicating both its own rights and the rights of its current and prospective users. There can be no doubt that this is sufficient to sustain a claim for declaratory and injunctive relief.

In fact, the State is effectively attempting to enforce a statute that this Court previously enjoined it from enforcing. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1130-34. Additionally, this Court, and others, routinely enjoin state actors from enforcing, prosecuting, investigating or reviewing any matter based on a legal premise that is declared to violate the First Amendment. *See, e.g.*, *Am. C.L. Union v. Johnson*, 194 F.3d 1149, 1163 n.11 (10th Cir. 1999); *Chapman*, 362 F.3d at 233; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 105 (2d Cir. 2003); *Reyes*, 748 F. Supp. 3d at 1130-34; *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1297 (D. Utah 2023).

### B.     The Communications Decency Act Immunizes The Conduct At Issue

Under Section 230, Congress granted all providers of interactive computer services "broad immunity" for "all claims stemming from their publication of information created by third parties." *Comput. & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1042 (citation omitted). Congress did so to preserve the "extraordinary advance in the availability of educational and informational resources" brought by the internet and interactive computer services, *see* 47 U.S.C. § 230(a)(l), and to ensure that the internet remained a "forum" for free-ranging intellectual inquiry and diverse political and cultural discourse, and a "vibrant and competitive free market ... unfettered by Federal or State regulation," *see id.* § 230(a)(3), (b)(2).

Subject to only a few narrow exceptions, Section 230 immunity exists whenever: (a) the party claiming immunity is a "provider . . . of an interactive computer service"; (b) the allegedly unlawful content was "provided by another information content provider"; and (c) another party seeks to "treat[]" the party claiming immunity as the "publisher or speaker" of that information. 47 U.S.C. § 230(c)(l). In other words, "[a] defendant loses its immunity to the extent that the cause of action seeks to treat the defendant 'as the publisher or speaker of its own content—or content

18

that it created or developed in whole or in part—rather than [as] the publisher or speaker of entirely third-party content." *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1151 (9th Cir. 2025) (citation omitted); *accord Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (holding that Section 230 immunizes an interactive computer service in the "exercise of its editorial and self-regulatory functions.").

All three elements of Section 230 are satisfied here.

***First***, as courts have recognized, Snap is a "provider" of an "interactive computer service" within the meaning of 47 U.S.C. §§ 230(c)(1) and 230(t)(2). *See, e.g.*, *L.W. ex rel. Doe v. Snap Inc.*, 675 F. Supp. 3d 1087, 1095 (S.D. Cal. 2023); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 825 (N.D. Cal. 2023).

***Second***, Defendants' pursuit of Snap and threat of an imminent civil lawsuit invariably treats Snap as a "publisher or speaker" of content, as Defendants' actions turn on Snap making content available to Utahans through the operation of Snapchat.[8] *Grindr Inc.*, 128 F.4th at 1151; *accord Ben Ezra*, 206 F.3d at 986.

***Third***, as noted, Defendants are threatening to impose imminent liability here because they

---

[8] To the extent the State views Snap as merely a "distributor" and not a "publisher or speaker," that is a distinction without a difference. *See Barrett v. Rosenthal*, 146 P.3d 510, 514, 519 (Cal. 2006) (finding no "reason to suppose that Congress intended to immunize 'publishers' but leave 'distributors' open to liability"). As courts have made clear, under Section 230 "distributors are considered to be publishers." *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019) (citation omitted); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997) ("[T]he probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes ...."); *In re Soc. Media*, 702 F. Supp. 3d at 827 ("Courts understand [publishing] to mean 'deciding whether to publish or to withdraw from publication third-party content'" and "editorial decisions and functions ancillary to the decision to make content available." (citation omitted)).

fundamentally disagree with who can access Snapchat—and how they can go about doing so—as well as the content displayed when accessing Snapchat. (Because Defendants believe that "parents of underage users [must be] given [an] opportunity to affirmatively consent to use of" Snapchat, that Snap has "inadequate age gate and deficient guardrails," and that specific Snapchat features are harmful.) This falls squarely within Snap's core function as a publisher or speaker of third-party content. Indeed, courts routinely recognize that Section 230 precludes claims related to specific features—like ephemeral messaging, Snap's recommendation algorithm, and Snap Streaks—and also prevents attempts to recast those claims as sounding in a failure-to-warn or a misrepresentation. *See, e.g.*, Snap's Complaint (ECF No. 1) (providing an overview of cases like *Grindr Inc.*, 128 F.4th at 1154; *M.P. v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025); *Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016); *Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1065 (N.D. Cal. 2025); *L.W.*, 675 F. Supp. 3d at 1095-96; *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (unpublished), *aff'd*, 2023 WL 4174061 (5th Cir. June 26, 2023)).

### C.    Declaratory Relief Is Necessary And Appropriate

The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). "Basically, the question in each [DJA] case is whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also Initiative & Referendum Inst. v. Walker*, 161 F. Supp. 2d 1307, 1311 (D. Utah 2001).

Here again, there is clearly a real and ongoing controversy regarding to the parties' legal

interests and duties. Plus, Snap is likely to succeed on its claims for a declaratory judgment as to Section 230 and the First Amendment for the reasons articulated above. Snap is also likely to succeed on its claim for a declaratory judgment as to COPPA, as Snapchat is not directed at children and Snap does not have actual knowledge that it is in possession of minors' data. *Cf. New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 516 F. Supp. 3d 1293, 1299 (D.N.M. 2021). Snap provides a neutral age gate in line with industry standards and FTC guidance that excludes registrants who indicate that they were born on a date that would make them under the age of 13.

*        *        *        *

As illustrated above, Snap "is likely to succeed on each of several theories," and Snap therefore has "strong[]" reasons for requesting injunctive relief. *See Does 1-11*, 100 F.4th at 1267.

## II.      Snap Faces A Substantial Threat Of Irreparable Injury

An injury is irreparable when "the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Snap has sustained several irreparable injuries here, for the following reasons.

*First*, "[t]he loss of First Amendment freedoms" to Snap and its current and prospective users, as outlined above, unquestionably "constitutes irreparable injury" to them. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). In fact, the loss of First Amendment freedoms is such a significant contravention of fundamental rights that "most courts hold that no further showing of irreparable injury is necessary." *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citation omitted); *see also Awad*, 670 F.3d at 1131. Snap can easily make a further showing here, though.

**Second**, the "loss of reputation, good will, marketing potential," and customers as a result of Utah's threatened actions "constitutes irreparable injury" as well. *See Lovesac Co.*, 2022 WL 504192, at *4 (collecting authority). "A civil enforcement action by the Attorney General's Office—even if ultimately found unconstitutional and in violation of federal law—will likely generate press releases and news coverage that harm Snap's reputation, goodwill, and marketing potential." Yadegar Decl. ¶ 15; *see also, e.g.*, *Utah sues Meta for child addiction harm and deceiving parents about dangers of Facebook and Instagram*, Governor of Utah Spencer J. Cox (Oct. 24, 2023), *available at* https://governor.utah.gov/press/utah-sues-meta-for-child-addiction-harm-and-deceiving-parents-about-dangers-of-facebook-and-instagram (asserting, among other things, that "Meta deceived parents and consumers").

**Third**, the imposition of nonrecoverable compliance costs—including the amount Snap would need to expend to implement the unconstitutional features called for by the State—constitutes an irreparable injury. *See, e.g.*, Yadegar Decl. ¶ 11 ("[I]mplementing different age verification requirements and/or age-related "guardrails" would require alterations to Snapchat's code, and would require substantial time and resources."); *see also, e.g.*, *Reyes*, 748 F. Supp. 3d at 1130-31; *see also, e.g.*, *Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902, 932 (D. Kan. 2024); *Cloud Peak Energy Inc. v. Unites States Dep't of Interior*, 415 F. Supp. 3d 1034 (D. Wyo. 2019). Such nonrecoverable compliance costs are undoubtedly many multiples in excess of the thousand dollars per year that constituted an irreparable injury in *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010), for example.

**Fourth**, "[a] credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." *KalshiEX*, 2025 WL 1073495, at *7

(collecting authority). That is because "[w]hen enforcement actions are imminent," as is the case here, "there is no adequate remedy at law," *id.* (quoting *Morales*, 504 U.S. at 381); *see also* Yadegar Decl. ¶¶ 12-15.

### III.    The Balance Of Equities And The Public Interest Weigh In Favor Of A Temporary Restraining Order And Preliminary Injunction

As noted, plaintiffs must show "that the balance of equities tips in their favor, and [also] that the injunction is in the public interest to obtain junctive relief." *Utah Vapor Bus. Ass'n Inc. v. Utah*, 2025 WL 1201731 at *8 (D. Utah Mar. 24, 2025) (unpublished). These two injunction factors "merge" when "the government is the opposing party." *Id.*

Here, Snap is seeking to vindicate its own First Amendment rights to publish—and its current and prospective users' First Amendment rights to access—constitutionally protected speech on Snapchat. This undoubtedly serves the public interest, as "it is always in the public interest to prevent the violation of a party's constitutional rights." *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (quoting *Awad*, 670 F.3d at 1132); *see also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

Here, Snap is also seeking to vindicate its own right to immunity under Section 230. This undoubtedly serves the public interest as well, as "it is clear that it would not be equitable or in the public's interest to allow the state ... to violate the requirements of federal law [with conflicting state law], especially when there are no adequate remedies available." *Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citations and internal quotations omitted); *see also KalshiEX*, 2025 WL 1073495, at *7. In such circumstances, the public's interest of preserving the Supremacy Clause is paramount. *See Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046,

1059-60 (9th Cir. 2009). Defendants, on the other hand, cannot assert that their threat of an imminent civil lawsuit is in the public interest, for virtually the same reason. *See Valle del Sol*, 732 F.3d at 1029); *see also Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024).

## IV.    A Bond Is Unnecessary

The posting of security for a temporary restraining order or preliminary injunction is vested with the Court's sound discretion. *Coquina Oil Corp. v. Transwestern Pipeline*, 825 F.2d 1461, 1462 (10th Cir. 1987); *accord RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009). Indeed, as relevant here, the Tenth Circuit has held that "a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'" *Coquina Oil*, 825 F.2d at 1462 (citation omitted).

Because this Motion "enforces fundamental constitutional rights against the government," the Court should determine that "[w]aiving the security requirement best accomplishes the purposes of Rule 65(c)." *Utah Drag Stars v. City of St. George*, 677 F.Supp.3d 1252, 1294 (D. Utah 2023) (quoting *United Utah Party v. Cox*, 268 F.Supp.3d 1227, 1260 (D. Utah 2017)); *Rocky Mountain Gun Owners v. Polis*, 685 F.Supp.3d 1033, 1061 (D. Colo. 2023) ("The Court finds a bond unnecessary as this case seeks to enforce a constitutional right against the government.").

## <u>CONCLUSION</u>

A temporary restraining order—and an order to show cause as to why a preliminary injunction should not issue—are appropriate here. Snap has shown that it is substantially likely to prevail on its arguments that Defendants cannot assert numerous claims against Snap without contravening the laws and/or Constitution of the United States. Granting the requested relief forthwith will not harm Defendants, and it will substantially promote the public interest. Most

importantly, Snap has shown that it will suffer irreparable harm if the requested relief is not granted. Accordingly, Snap has met the requirements for a temporary restraining order—and preliminary injunction—and respectfully requests that the Court grant its requested relief.

DATED  this 20th day of June, 2025.                    Respectfully Submitted,

SNELL & WILMER LLP

By:      /s/ Matthew L. Lalli
         Matthew L. Lalli
         Annika L. Jones

PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
Kimberly O. Branscome (*pro hac vice to be filed*)
Jonathan Tam (*pro hac vice to be filed*)
Matthew P. Steinberg (*pro hac vice to be filed*)

*Attorneys for Plaintiff Snap Inc.*